In the

# United States Court of Appeals

## For the Seventh Circuit

No. 08-2316

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

ROBERT MCMATH,

*Defendant-Appellant.*

Appeal from the United States District Court
for the Eastern District of Wisconsin.
No. 07-CR-154—**Charles N. Clevert, Jr.**, *Judge.*

ARGUED JANUARY 16, 2009—DECIDED MARCH 19, 2009

Before BAUER, FLAUM, and WOOD, *Circuit Judges*.

FLAUM, *Circuit Judge.* Robert McMath was convicted in a one-day jury trial of possessing a firearm after being convicted of a felony in violation of 18 U.S.C. §§ 922(g)(1) and 924(a)(2). The district court sentenced McMath to sixty-three months in prison, which included a two-level enhancement for perjury and obstruction of justice. McMath challenges both his conviction and sentence on appeal. With regard to his conviction, McMath argues that the district court erred when it did not make factual

findings pursuant to his *Batson* challenge and also that remarks made by the prosecutor during closing arguments denied him of a fair trial. With regard to his sentence, McMath challenges the district court's two-level enhancement of his sentence for obstruction of justice.

For the reasons explained below, we remand this case for further proceedings in light of this opinion. Upon remand, the district court should first determine whether it can make factual findings on the *Batson* issue. If it is unable to do so or finds that McMath's challenge was meritorious, it must vacate McMath's conviction. If the district court is able to make factual findings and holds that the *Batson* challenge should be denied, the district court should proceed to resentencing in light of our conclusion that the district court's obstruction of justice enhancement relied on a mistaken factual finding.

## I. Background

### A. Events of May 8, 2007

On the evening of May 8, 2007, Milwaukee police officers Chad Boyack and Cory Washington were on patrol when they observed a Pontiac Bonneville driving above the speed limit. The officers pursued the vehicle and activated their lights and siren. The officers observed the rear passenger (later identified as McMath, an African American male) sitting "between the middle and passenger side" of the vehicle. Both officers noticed McMath moving around in the back of the car. As the vehicles approached the corner of Keefe and Palmer

streets, the Bonneville took a fast, hard right turn. As it made the turn, the squad car's lights shone into the Bonneville and both officers observed McMath lift himself up, put both arms toward the back passenger window (which was about half-way open), and toss a gun out of the window.

The Bonneville pulled over about a half-block later and the officers arrested McMath. The officers noticed that the back passenger-side window was still about half-way down. The gun was later recovered from the west side of Palmer Street.

**B. Jury Selection**

The district court called thirty-six prospective jurors for the voir dire in McMath's case. No jurors were excused for cause. The government exercised one of its peremptory challenges to excuse Juror 7, one of two African-American jurors on the panel. When the clerk announced the jurors selected, McMath's counsel, Mr. Erickson, objected and the prosecutor, Ms. Blackwood, responded. The following excerpt from pre-trial proceedings captures the entire discussion regarding the challenge:

| MR. ERICKSON: | I have an issue about Juror 7, the African-American. |
| THE COURT: | All right. |
| MR. ERICKSON: | So, I mean, if you want to—do you want me to do it now? |
| THE COURT: | What is the issue? |

MR. ERICKSON:        Yeah, I was thinking under *Batson*, obviously he's African-American. He was struck. The only information we had about him is he was retired. He worked at Social Services, janitorial. There's other jurors left on this jury that are retired. Under similar circumstances I think it would be incumbent upon the Government to raise a racially neutral factor at this point.

MS. BLACKWOOD:       Your honor, there are two African-Americans that were on the panel; one was struck. There is no pattern of discrimination that's been demonstrated.

MR. ERICKSON:        Your honor, even though one is left on, there still, I think, has to be a race neutral factor and there's not here.

MS. BLACKWOOD:       Race neutral factor is expression on his face. That's all I can say. He looked angry and not happy to be here.

MR. ERICKSON:        I think pretty much the whole jury looked like that.

MS. BLACKWOOD:       I disagree. I didn't see that expression.

| | |
|---|---|
| MR. ERICKSON: | There were several people that had the same expression. |
| THE COURT: | The *Batson* challenge is denied. |

The district court did not discuss the matter further and Juror 7 was excused.

### C.  The Trial and Closing Statements

At trial, the government's case relied almost exclusively on the testimony of Officers Boyack and Washington, who testified to the facts outlined above. McMath took the stand in his defense and testified that he had been drinking that night and that he had dozed off during the car ride with his head against the back driver's-side window. He stated that he awoke when the car took the hard right turn and he "kind of leaned" to the right side. He said that he ended up on the right/passenger side of the car because he was "kind of—wobbly, so I went over that way." He denied throwing a gun out of the rear window and stated that he did not see anyone throw a gun out of the car. On cross, McMath acknowledged that he knew that he would go to prison if he was caught with a gun. He also admitted that he asked an officer during an interview later that night, "If I can prove that the gun isn't mine, I can beat this, right?"

The prosecution's closing statement and rebuttal statement contained two types of remarks now challenged on

appeal.[1] First, the prosecutor commented on the credibility of the testifying police officers as well as McMath. In her closing statement, the prosecutor stated that the jury should believe the officers because "[t]hey're not out to get Robert McMath. They're out to get guns off the street and out of the hands of felons, and they saw what they saw." In her rebuttal, the prosecutor also told the jury that the officers would lose their jobs if they lied:

> [I]f you want to buy that they came in and perjured themselves to get Robert McMath who they don't know from Adam just to get somebody, that would be immoral; that would be unethical, that would be a million things; that would be the loss of their job. I mean, you know, is that reasonable . . . ?

The prosecutor stated that she "knew" McMath did not want to admit his guilt to the jury and that his story was "completely bogus" based on "physics and centrifugal force" in the car.

Second, the prosecutor made statements regarding the lack of DNA evidence in the case. During her rebuttal, the prosecutor stated:

---

[1] For context, McMath's attorney argued in closing that the police conducted a sloppy investigation. He stated that the police likely did not see who threw the gun out the window but attributed it to McMath after he handed them a Wisconsin Department of Corrections identification card. Defense counsel also pointed out that there was no physical evidence, such as DNA or fingerprints, linking McMath to the gun. Finally, McMath's counsel argued that there was reasonable doubt.

> Now, again, you know, this whole specter of finger-
> prints and DNA evidence and equating that with
> reasonable doubt; once again, I'm afraid that Holly-
> wood has done a service—disservice to law enforce-
> ment because Hollywood makes you believe that
> you're always going to be expecting to find DNA and
> fingerprint evidence.

She also implied that one reason the government did this forensic testing was to prevent defense counsel from pointing out the lack of such testing:

> Well, I guess we're damned if we do, and we're
> damned if we don't. Why did they even check for DNA
> and fingerprint evidence if it doesn't matter. That's
> what he [defense counsel] says. And yet if we hadn't
> checked for it he'd be stomping and pounding the
> podium and yelling about why didn't they check for
> prints, why didn't they check for DNA; so police do
> it as a matter of course. Sometimes you're lucky;
> sometimes you're not.

After closing statements the jury retired to deliberate and returned a guilty verdict on the one-count indictment.

### D. Sentencing

The district court sentenced McMath to sixty-three months in prison, which included a two-level increase in his offense level for obstruction of justice pursuant to U.S.S.G. § 3C1.1.

In explaining its decision on the obstruction enhance-ment, the district court recounted portions of McMath's

testimony. The court said that "Mr. McMath's state-
ment regarding his activities in the car, his location in the
car, his denial that he had a gun or saw a gun in my
view were untrue, perjury, an attempt to obstruct the
proceeding and a factual basis for this court to assess the
two points under the sentencing guidelines." Significantly,
the district court also discussed a photograph of the
Pontiac Bonneville that showed that the window on the
rear passenger side was open. The district court asserted
that McMath had testified that the window was up, and
stated that "[t]hat [discrepancy] alone is enough to
justify the obstruction points. That alone." At sentencing
McMath, the district court told McMath:

> [Y]ou did not tell the truth when you took the stand
> in this case. And if your perjury were not as clear
> the court might be more inclined to cut you a break.
> That's one reason why I even asked you if you
> wished to make a statement. That's one reason why
> I gave you an opportunity to reflect on what you
> testified to during the trial. That is one reason why
> I offered up the photograph [of the car], so that you
> could observe that when you testified about the win-
> dow in the back seat of the car being up, the objective
> proof shows it was not. But you still did not accept
> responsibility.

However, contrary to the district court's assertion, the trial
transcript shows that McMath did not testify that the
rear window on the passenger side was closed; rather he
testified that the rear window on the *driver's* side was
closed.

## II.  Discussion

### A.  *Batson* Challenge

In *Batson v. Kentucky*, 476 U.S. 79 (1986) the Supreme Court held that a state's exercise of peremptory challenges to exclude jurors on account of race violated the defendant's equal protection rights. *Batson* challenges require a three-step inquiry: (1) the defendant must establish a prima facie case that a peremptory challenge was used to exclude a juror on the basis of race; (2) once the defendant establishes the prima facie case, the prosecutor must provide a race-neutral explanation for the exclusion; and (3) the court must determine whether the objecting party has carried his burden to prove discrimination. *United States v. Cooper*, 19 F.3d 1154, 1158 (7th Cir. 1994).

McMath alleges that the district court improperly failed to make factual findings when ruling on his *Batson* challenge. Traditionally, we review the district court's *Batson* findings for clear error. *See Rice v. Collins*, 546 U.S. 333, 338 (2006) ("On direct appeal in federal court, the credibility findings a trial court makes in a *Batson* inquiry are reviewed for clear error."); *accord United States v. Evans*, 192 F.3d 698, 700 (7th Cir. 1999). However, because McMath alleges that the district court failed to appropriately conduct the *Batson* inquiry, a legal error, our review is de novo.[2]

---

[2]  In *United States v. Taylor*, 509 F.3d 839, 843-44 (7th Cir. 2007), we declined the defendants' invitation to apply de novo review

(continued...)

As recounted above, the district court denied McMath's *Batson* challenge without comment on the matter. McMath argues that by not making factual findings on the credibility of the government's proffered race-neutral reason for the strike, the district court acted contrary to the Supreme Court's recent decision in *Snyder v. Louisiana*, ___ U.S. ___, 128 S.Ct. 1203, 1207-08 (2008). The government asserts that McMath failed to make a prima facie case of discrimination, as required by *Batson*, and also that the judge's ultimate denial of the *Batson* challenge should be understood as "implicit findings" on whether the prosecutor's race-neutral reason was credible.

We first look to the government's argument that McMath never satisfied the first prong of the *Batson* inquiry of making a prima facie case of discrimination. As an initial matter, this argument appears to be moot under

---

[2] (...continued)
to what the defendant characterized as the district court's misapprehension of the *Batson* procedure. However, in that case, unlike here, the court found the defendant's claims of legal error to be overstated. Here, that is not the case, and de novo review of the district court's *Batson* inquiry appears to be appropriate. In any event, however, a mistake of law generally satisfies clear error, de novo or for that matter abuse of discretion review. *See Maynard v. Nygren*, 332 F.3d 462, 467 (7th Cir. 2003) ("[A] district court by definition abuses its discretion when it makes an error of law, and, while factual findings are generally reviewed only for clear error, findings which are tainted by the application of an inapposite standard are subject to fuller review") (internal citations omitted).

*Hernandez v. New York*, 500 U.S. 352, 356-58 (1991) because, despite the government's contention now that the defendant did not present a prima facie case, at the time of the challenge, the prosecution provided a race-neutral reason and the district court ruled on the *Batson* challenge. In *Hernandez*, the Supreme Court considered essentially the same scenario. In that case, the defendant raised a *Batson* objection, and, as in this case, the prosecutor did not wait for a ruling on whether the defendant had established a prima facie question of racial discrimination. Rather, the prosecutor volunteered his reasons for striking the jurors in question and the trial court denied the defendant's challenge to the exclusion. *Id*. at 356-58. The Supreme Court ruled that in this situation—where "a prosecutor has offered a race-neutral explanation for the peremptory challenges and the trial court has ruled on the ultimate question of intentional discrimination"—the issue of whether the defendant has made a prima facie case "becomes moot." *Id*. at 359. It thus appears that the question of whether McMath made a prima facie case is moot.

However, even if this question was not moot, it appears that the defendant satisfied the requirements of the prima facie case. In *Johnson v. California*, 545 U.S. 162, 173 (2005), the Supreme Court reaffirmed the principle that, in making a prima facie case, a defendant need only produce evidence sufficient to permit an inference of discrimination in order to satisfy the first step of the *Batson* analysis. The test is not rigorous: suspicion even less than "more likely than not" suffices. *See id*.; *accord United States v. Stephens*, 421 F.3d 503, 512 (7th Cir. 2005)

("[T]he burden at the prima facie stage is low, requiring only circumstances raising a suspicion that discrimination occurred, even when those circumstances are insufficient to indicate that it is more likely than not that the challenges were used to discriminate.").

Here, the defendant met this threshold. The defendant noted that the prosecution had used its peremptory challenge to remove Juror 7, one of two African-American jurors, and also noted that "[t]he only information we had about him is he was retired. He worked at Social Services, janitorial. There's other jurors left on this jury that are retired [who were not struck]." Although this evidence is certainly not conclusive, it suffices for the prima facie case. While it is true that it would not have been sufficient for defense counsel merely to point to the stricken juror's race, *see, e.g.*, *Anderson v. Cowan*, 227 F.3d 893, 901-02 (7th Cir. 2000), defense counsel's statement that jurors sharing Juror 7's only other known characteristic, his status as a retiree, had been retained by the prosecution pointed out a relevant circumstance that was sufficient to permit an inference of discrimination and prompt the prosecution to provide a race neutral justification for the exclusion. *See United States v. Taylor*, 509 F.3d 839, 844 (7th Cir. 2007) (proper to compare stricken black jurors to unstricken white jurors in the context of a *Batson* challenge) (citing *Miller-El v. Dretke*, 545 U.S. 231, 241 (2005)).

We turn now to the second step of the *Batson* inquiry in this case. The government claimed that it struck Juror 7 because of the expression on his face; specifically, the

government stated that he "looked angry and not happy to be here." It is well-established that a juror's demeanor is a valid race-neutral basis for a peremptory strike, which is all that is required for step two of the Batson inquiry. *See, e.g.*, *United States v. Hinton*, 94 F.3d 396, 397-98 (7th Cir. 1996) (listing a number of demeanor-based reasons which may properly be the basis of choosing jurors); *see also United States v. Briscoe*, 896 F.2d 1476, 1489 (7th Cir. 1990) (accepting that "intuitive assumptions that are not fairly quantifiable" play a role in jury selection). Thus, the prosecutor's reason, if credible, was a proper reason for striking Juror 7 in this case.

We thus come to the third step of the *Batson* inquiry: the district court's determination regarding discrimination. Specifically, we must decide whether the district court's summary ruling on the *Batson* issue was legally sufficient to dispose of McMath's *Batson* challenge. The Supreme Court's recent decision in *Snyder v. Louisiana*, ___ U.S. ___, 128 S.Ct. 1203, 1207-08 (2008) is highly relevant to our analysis. In *Snyder*, the defendant made a *Batson* challenge and the prosecutor explained that he had requested the strike first because the juror in question looked "nervous," and second because the prosecutor worried that the juror might attempt to deliver a guilty verdict to a lesser charge in order to keep deliberations short and get back to his job more quickly. The trial court did not make any findings regarding the challenge, saying only: "All right. I'm going to allow the challenge. I'm going to allow the challenge." *Id.* at 1208.

The Supreme Court first emphasized that the trial court has a "pivotal role" in evaluating *Batson* claims. *Id.* at 1208.

The Court noted that especially where "race-neutral reasons for peremptory challenges [ ] invoke a juror's demeanor (e.g., nervousness, inattention)," the trial court's first-hand observations are "of even greater importance." *Id*. The Court stated that when a prosecutor invokes a juror's demeanor as the race-neutral reason for the strike, "the trial court must evaluate not only whether the prosecutor's demeanor belies a discriminatory intent, but also whether the juror's demeanor can credibly be said to have exhibited the basis for the strike attributed to the juror by the prosecutor." *Id*.

In reviewing the case, the Supreme Court observed that "nervousness" could not be shown from a cold transcript, which, it noted again, showed why the trial judge's evaluation must be given deference. *Id*. at 1209. However, the trial judge in *Snyder* had not made findings concerning the juror's demeanor and instead simply allowed the peremptory strike without explanation. As the Court observed, it was difficult to tell why the trial court denied the challenge. *Id.* The trial judge may not have recalled the juror's demeanor at the time it made its ultimate ruling (a day after the challenge), or the judge may have credited the prosecutor's second basis for the strike (that the juror was likely to deliver a verdict to a lesser charge in order to keep deliberations short). Because there was no way to tell why the judge ruled as it did, the Court could not "presume that the trial judge credited the prosecutor's assertion that [the juror] was nervous." *Id.* at 1209. In light of the "absence of anything in the record showing that the trial judge credited the claim that [the juror] was nervous"—and because the

prosecutor's second basis for the strike appeared to be pretextual, *see id.* at 1209-12—the record did not show that the prosecution would have pre-emptively challenged the juror based on his nervousness alone. *Id*. at 1212. Since there was no "realistic possibility that this subtle question of causation [for the peremptory challenge] could be profitably explored further on remand" more than a decade after the defendant's trial, the Court's ruling had the effect of setting aside the defendant's conviction and sentence. *See State v. Snyder*, 982 So. 2d 763 (La. 2008) (observing that the Supreme Court's decision "effectively sets aside defendant's conviction and sentence").

Here, like *Snyder*, the district court made no findings regarding the prosecutor's race-neutral demeanor-based justification of the strike. Rather, the judge simply stated that the *Batson* challenge was denied. The district court did not indicate whether it agreed that Juror 7 had an unhappy expression on his face, did not indicate whether this expression was unique to Juror 7 or common to other jurors, and made no evaluation of the prosecutor's credibility. Like *Snyder*, the record here does not show that the prosecutor based the strike on Juror 7's expression alone and, as *Snyder* teaches, we cannot presume that the prosecutor's race-neutral justification was credible simply because the district judge ultimately denied the challenge.

The government urges us to find that the district court's summary denial was an "implicit finding" that the prosecutor's explanation was credible. However, the notion that a district judge's summary denial of a *Batson* chal-

lenge can be interpreted as "implicit findings" on the proffered race-neutral justification for the strike clearly undermines *Snyder*. *Id.* at 1209. *Snyder* makes clear that a summary denial does not allow us to assume that the prosecution's reason was credible; rather, the district court's silence leaves a void in the record that does not allow us to affirm the denial. We thus conclude that the district court clearly erred in denying the *Batson* challenge without making findings regarding the credibility of the proffered race-neutral justification for the strike.

We believe that remanding for further findings and a possible evidentiary hearing on the *Batson* issue is the most appropriate step at this time. *See, e.g., Taylor*, 509 F.3d at 845-46 (retaining jurisdiction but remanding for the district court to supplement the record with factual findings); *United States v. Taylor*, 277 Fed. Appx. 610, 612-13 (7th Cir. May 13, 2008) ("*Taylor II*") (concluding that the district court made insufficient factual findings after *Taylor I* and remanding again for an evidentiary hearing to develop the record). In *Snyder*, remand for the trial judge to make findings regarding the juror's demeanor was deemed fruitless because the trial had occurred more than ten years prior. *Id.* at 1212 ("[T]here is no realistic possibility that this subtle question of causation could be profitably explored further on remand at this late date, more than a decade after petitioner's trial."). But remand may be more worthwhile in this case, as voir dire occurred only a little over a year ago. While it is certainly possible that the passage of time will make it impossible for the district judge to make findings of fact, our concern for judicial economy persuades us that

allowing the district judge the opportunity for such findings is the correct course. Upon remand, if the passage of time precludes the district court from making factual findings, it must vacate the judgment of conviction. In the event the district court can arrive at appropriate findings of fact satisfying the *Batson* inquiry, it should proceed to resentencing in accord with this opinion, as explained in Part C of our analysis.

**B. Prosecutorial Misconduct**

The defendant claims that several comments made by the prosecutor in her closing argument and rebuttal argument denied him a fair trial. Because McMath did not object to the remarks during trial, we review for plain error. *See* Fed. R. Crim. P. 52(b); *United States v. Olano*, 507 U.S. 725, 731-36 (1993). Reversal is only warranted where there is "(1) error, (2) that is plain, and (3) that affect[s] substantial rights" and "(4) the error seriously affect[s] the fairness, integrity, or public reputation of judicial proceedings." *See Johnson v. United States*, 520 U.S. 461, 466-67 (1997) (internal quotations omitted).

This Court employs a two-part test to assess allegations of prosecutorial misconduct in closing arguments. First, the court will "consider the prosecutor's disputed remarks in isolation to determine whether they are improper." *United States v. Johnson-Dix*, 54 F.3d 1295, 1304 (7th Cir. 1995). If the remarks are improper in isolation, we "consider the remarks in the context of the entire record and assess whether they ad the effect of denying the defendant

a fair trial." *Id.* In analyzing the statements, the court
should consider

> the nature and seriousness of the statement; whether
> the statement was invited by the conduct of defense
> counsel; whether the district court sufficiently in-
> structed the jury to disregard such statements; whether
> the defense could counter the improper statement
> through rebuttal; and finally, whether the weight of
> the evidence was against the defendant.

*United States v. Severson*, 3 F.3d 1005, 1014 (7th Cir. 1993);
*accord Johnson-Dix*, 54 F.3d at 1304 (quoting *Severson*, 3
F.3d at 1014). As a general matter, improper comments
during closing arguments "rarely rise to the level of
reversible error, and considerable discretion is entrusted
to the district court to supervise the arguments of coun-
sel." *United States v. Wilson*, 985 F.2d 348, 353 (7th Cir.
1993) (quotation marks and citation omitted).

### 1.  Comments Regarding Witness Credibility

We first consider the prosecutor's remarks about the
police officers' testimony. The prosecutor stated that the
jury should believe the police officer witnesses because
"[t]hey're not out to get Robert McMath. They're out to
get guns off the street and out of the hands of felons, and
they saw what they saw." In her rebuttal, the prosecutor
also told the jury that the testimony of the officers was
"clear and really credible" and further commented that
the officers would lose their jobs if they lied. The first
comment—that the officers' goal was to get guns of the

street—did not likely have a negative effect on the jury. The jury heard evidence that McMath was arrested by the officers for being a felon in possession of a weapon, and thus likely intuited that combating such conduct was part of the officers' job. *See United States v. Amerson*, 185 F.3d 676, 686 (7th Cir. 1999) (prosecutor's statement that it was officers' job to arrest dope peddlers was not improper vouching). The prosecutor's comment regarding the officers being "really credible," while technically improper vouching, also seems fairly innocuous in context. Credibility was a central issue in the case and while the prosecutor should not have commented directly on the officers' credibility, we cannot conclude that McMath's substantial rights were affected by the remark.

However, it was improper for the prosecutor to say that the officers would lose their jobs if they lied, as the government has conceded. *See Johnson-Dix*, 54 F.3d at 1304-05 (improper for prosecutor to assert that law enforcement agent would risk his job if he lied); *United States v. Swiatek*, 819 F.2d 721, 731 (7th Cir.) (improper for prosecutor to argue that agent had no reason to lie and to risk his career and reputation), *cert. denied*, 484 U.S. 903 (1987). Thus, we must consider whether the statement—in the context of the entire record—deprived McMath of a fair trial.

We first note that McMath's counsel had no opportunity to counter the statement, as it was made in the government's rebuttal argument. However, the rest of the relevant factors counsel against a finding that McMath's substantial rights were violated by this comment. The

prosecutor did not misstate any evidence in her remark. Although the district court did not immediately instruct the jury to disregard the comment, it later instructed the jury that closing arguments were not evidence. Most importantly, the record reflects that the officers' credibility was solidly established apart from the prosecutor's improper remark. The defendant's cross-examinations of the officers revealed no significant inconsistencies in their testimony or biases which may have motivated them to lie. Thus, although the remark was improper, we do not believe that it jeopardized the fairness or integrity of McMath's trial. *See Johnson*, 520 U.S. at 466-67.

The prosecutor also made remarks about McMath's credibility. She stated that McMath's story was "completely bogus" based on "physics and centrifugal force" in the car and that she "knew" McMath did not want to admit his guilt to the jury. These comments did not constitute plain error. First, the prosecutor was in some sense correct that McMath's testimony was belied by physics. McMath testified that when the Bonneville took a hard right turn he leaned to the right. But when a car turns right, passengers are thrown to the left. Second, while the prosecutor probably should not have said that she "knew" McMath did not want to admit his guilt, challenging McMath's veracity and stating that his version was "bogus" does not meet the standard for plain error. We have held that a prosecutor is permitted to draw reasonable inferences from the evidence in discussing witness credibility, and may go so far as to call the defendant a liar if the record supports that accusation. *See United States v. Andreas*, 216 F.3d 645, 671 (7th Cir.

2000). Here, there was reason to question McMath's account. In any case, these statements did not affect the fairness of the trial and thus do not constitute plain error.

### 2. Comments Regarding Physical Evidence

McMath challenges the prosecutor's statements made in rebuttal regarding the lack of DNA evidence. In McMath's closing argument, his lawyer stated, regarding DNA evidence:

> You know, if that wasn't really important, why the heck did [the police] [have the gun checked for prints and DNA]? I mean, no matter what spin is put on it, [McMath's] fingerprints are not on that gun, his DNA are [sic] not on that gun.

During her rebuttal, the prosecutor stated:

> Now, again, you know, this whole specter of finger-prints and DNA evidence and equating that with reasonable doubt; once again, I'm afraid that Holly-wood has done a service—disservice to law enforce-ment because Hollywood makes you believe that you're always going to be expecting to find DNA and fingerprint evidence.

The prosecutor also indicated that one reason the government conducted DNA and fingerprint testing was to prevent defense counsel from pointing out the lack of such testing. Specifically, she stated:

> Well, I guess we're damned if we do, and we're damned if we don't. Why did they even check for DNA

and fingerprint evidence if it doesn't matter. That's what he [defense counsel] says. And yet if we hadn't checked for it he'd be stomping and pounding the podium and yelling about why didn't they check for prints, why didn't they check for DNA; so police do it as a matter of course. Sometimes you're lucky; sometimes you're not.

McMath argues that these statements were not based on the evidence and violated a district court ruling which barred Officer Boyack from testifying to similar matters.

We do not find these comments to be clear error. While the district court had earlier ruled that Officer Boyack could not testify about the frequency with which DNA or fingerprint evidence was obtained, it is worth noting that neither the defendant nor the court made any contemporaneous objection to the prosecutor's comments. This is not entirely surprising: it does not appear that the prosecutor was trying to introduce expert-type testimony about the frequency with which DNA or fingerprint evidence is obtained, as defendant contends. Rather, the prosecutor was stating—perhaps inartfully—that such results cannot always be expected and that the absence of such evidence should not be held against the government. As the government states, the comment "was not a reference to 'facts' outside the record, but instead was an argument about how the jury ought to weigh the absence of scientific evidence." In any case, even if the comments shaded into impermissible commentary, the comments did not render the petitioner's trial unfair.

## C. Sentencing

McMath contends that the district court based its obstruction of justice sentencing enhancement on a mistaken belief regarding McMath's testimony. We review de novo the adequacy of the district court's obstruction of justice findings and any underlying factual findings for clear error. *United States v. Carroll*, 412 F.3d 787, 793 (7th Cir. 2005).

In reaching its decision on the enhancement, the district stated that "Mr. McMath's statement regarding his activities in the car, his location in the car, his denial that he had a gun or saw a gun in my view were untrue, perjury, an attempt to obstruct the proceeding and a factual basis for this court to assess the two points under the sentencing guidelines." The court also relied in part on a photograph of the Bonneville that showed that the window on the rear passenger side was open. The district court asserted that McMath had testified that the window was closed, and stated that "[t]hat alone is enough to justify the obstruction points. That alone."

In sentencing McMath, the district court told him:

> [Y]ou did not tell the truth when you took the stand in this case. And if your perjury were not as clear the court might be more inclined to cut you a break. That's one reason why I even asked you if you wished to make a statement. That's one reason why I gave you an opportunity to reflect on what you testified to during the trial. That is one reason why I offered up the photograph [of the car], so that you could observe that when you testified about the window in the

back seat of the car being up, the objective proof shows it was not. But you still did not accept responsibility.

However, the trial transcript shows that McMath did not testify that the rear window on the passenger side was closed; rather he testified that the rear window on the *driver's* side was closed.

Q. And your window was halfway open, correct?

A. No, my window was up.

Q. Your window was up?

A. Yeah, my arm—the window behind the driver was up. The window I was laying on—

Q. But the other window was halfway open, correct?

A. I mean, I really don't even know; but I seen from the pictures that it was, so yes.

It thus appears that the district court was mistaken when it found that McMath had testified falsely that the passenger-side window was closed.

We must defer to the district court's findings of fact unless they are clearly erroneous, and we arrive at a "definite and firm conviction that a mistake has been made." *United States v. Brierton*, 165 F.3d 1133, 1137 (7th Cir. 1999). Although the district court based its perjury finding on several areas of McMath's testimony other than testimony regarding the passenger-side window, the district court focused on the window issue quite a lot when pronouncing McMath's sentence. The district court even stated that "if your perjury were not as clear

the court might be more inclined to cut you a break. . . . That is one reason why I offered up the photograph [of the car], so that you could observe that when you testified about the window in the back seat of the car being up, the objective proof shows it was not. "

Where a district court selects a guidelines range by relying on a clearly erroneous factual finding, "we are obliged to remand for resentencing unless, reviewing the record as a whole, we can conclude that the error was harmless, i.e., that the error did not affect the district court's selection of the sentence imposed." *United States v. Hollis*, 230 F.3d 955, 958 (7th Cir. 2000) (citing *Williams v. United States*, 503 U.S. 193, 201-04 (1992)). Here, we cannot conclude that the error did not affect the district court's sentence and thus we vacate and remand for possible resentencing.[3] *See, e.g., United States v. Berheide*, 421 F.3d 538, 539 (7th Cir. 2005) (vacating and remanding sentence because district court relied on erroneous factual finding regarding loss amount).

### III.  Conclusion

For the reasons explained above, we REMAND this case for further proceedings in light of this opinion. Upon remand, the district court should first determine whether

---

[3] Of course, resentencing will only be necessary if the district court is able to make factual findings on the *Batson* issue and concludes that the *Batson* challenge should be denied, as explained above.

it can make factual findings on the *Batson* issue. If it is unable to do so or finds that McMath's challenge was meritorious, it should vacate McMath's conviction. If the district court is able to make factual findings and holds that the *Batson* challenge should be denied, the district court should proceed to resentencing in light of our conclusion that the district court's obstruction of justice enhancement relied on a mistaken factual finding.