JERRY E. SMITH, Circuit Judge:
Eugene Thompson, as a member of a six-person drug conspiracy, was convicted by a jury of violations of federal drug and gun laws. He appeals the denial of his Batson challenge and questions the sufficiency of the evidence. Finding no reversible error, we affirm.
I.
Thompson faced four counts. He was charged in Count One with conspiracy to distribute and possess with intent to distribute more than 280 grams of crack cocaine, in violation of 21 U.S.C. § 846; in Count Two with possession with intent to distribute crack cocaine, in violation of 21 U.S.C. § 841(a)(1) and (b)(1)(A) and (C) and 18 U.S.C. § 2; in Count Three with possession of a firearm in furtherance of a drug-trafficking crime, in violation of 18 U.S.C. § 924(c)(1)(A)© and 18 U.S.C. § 2; and in Count Four with possession of a firearm by a convicted felon, in violation of 18 U.S.C. §§ 922(g)(1) and 942(a)(2).
During voir dire, Thompson challenged the government’s decision to use five of its seven peremptory strikes against black prospective jurors (Jurors 4, 23, 25, 26, and 37) under Batson v. Kentucky, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986). Assuming arguendo that Thompson had established a prima facie case of discrimination, the district court asked the prosecutor to articulate the reasons for the strikes. For Jurors 23 and 37, the government justified its decision solely on its observations of the juror’s demeanor[1] during voir dire.[2] For Jurors 4, 25, and 26, the government relied on both observations of the juror’s demeanor[3] and other *295 perceived sources of bias toward the government.[4]
After hearing each of the prosecutor’s justifications, the court gave Thompson an opportunity to argue that those reasons were pretext for discrimination. Defense counsel disputed the government’s characterizations of the jurors’ demeanor[5] and the other stated justifications.[6] Having been able to witness the voir dire and assess each side’s credibility, the court denied the Batson challenge, finding each of the government’s proffered reasons credible. Thompson appeals the denial of his Batson challenge.
Following this exchange, in light of the fact that the defense had used , all eleven of its peremptory challenges on white jurors, the government made a reverse Batson challenge. Just like the government, defense counsel justified some of its peremptory challenges solely on the basis of demeanor.[7] As with the government, the *296 district court credited the defense’s observations of the jurors as facially-neutral, non-pretextual justifications. The court, however, found two of the justifications given by defense counsel to be pretextual.[8] Thompson does not appeal the grant of the reverse Batson challenge.[9]
After the close of the government's case, Thompson moved for a judgment of acquittal, which, after hearing arguments, the district court denied. The jury found Thompson guilty on. all counts. Thompson appeals the denial of the motion for acquittal. After the close of the government’s ease, Thompson moved for a judgment of acquittal, which, after hearing arguments, the district court denied. The jury found Thompson guilty on. all counts. Thompson appeals the denial of the motion for acquittal.
II.
In Batson v. Kentucky, 476 U.S. 79, 93-98, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986), the Court outlined a three-part framework for evaluating claims that a prosecutor used peremptory challenges in violation of the Equal Protection Clause. To raise a'successful Batson challenge, a defendant must first make a prima facie showing that the prosecutor used a peremptory challenge to strike a juror on the basis of his race. Second, if the defendant has made such a showing, the prosecution must then offer a race-neutral basis for the strike. Finally, the district court must determine whether the defendant has carried his burden of proving purposeful discrimination.
 A district court makes a finding fact when it determines whether a prosecutor has purposively discriminated on the basis of race in striking a juror. See Hernandez v. New York, 500 U.S. 352, 367, 111 S.Ct. 1859, 114 L.Ed.2d 395 (1991). This court does not overturn such factual findings absent clear error. See United States v. Bentley-Smith, 2 F.3d 1368, 1372 (5th Cir.1993). These factual findings warrant great deference, because the district court “obServ[es] the voir dire, know[s] the layout of the courtroom better than a writ- ten description can provide, and [is] able to consider the demeanor of the prosecutor.” United States v. Turner, 674 F.3d 420, 436 (5th Cir.), cert. denied, - U.S. -, 133 S.Ct. 302, 184 L.Ed.2d 178 (2012).[10] We review the government’s proffered race-neutral explanation as a legal issue de novo. United States v. Williams, 264 F.3d 561, 571 (5th Cir.2001).
Thompson has raised Batson challenges on all of the five black jurors struck. To succeed on his Batson challenge, however, he only needs to show that the prosecutor struck one juror on the basis of race.[11]
*297 We do not need to address whether Thompson has sufficiently established a prima facie case of discrimination. The government’s offer of race-neutral reasons removes that question from our review.[12]
Turning to Batson’s second step, for two of the five black jurors struck, the government justified its decision solely[13] on its observations of the jurors’ demeanor during voir dire. For the other three black jurors, the government justified its decision to strike on both observations of demeanor and other perceived sources of bias toward the government. None of these justifications, on its face, invokes the juror’s race.[14]
Thus, moving to Batson’s third step, the question is whether, contrary to the district court’s finding, Thompson has proven that the government’s purported facially neutral reasons were pretexts for purposeful discrimination. At this step in the Batson analysis, “implausible or fantastic justifications may (and probably will) be found to be pretexts for purposeful discrimination.” Purkett v. Elem, 514 U.S. 765, 768, 115 S.Ct. 1769, 131 L.Ed.2d 834 (1995) (per curiam). A prosecutor’s intuitive assumptions, inarticulable factors, or even hunches can, however, be proper bases for rejecting a potential juror. See Bentley-Smith, 2 F.3d at 1374. At Bat-son’s third step, courts do not assess whether “counsel’s reason is suspect, or weak, or irrational.” Id. at 1375. Instead, courts address “whether counsel is telling the truth in his or her assertion that the challenge is not race-based.” Id. In determining whether a prosecutor discriminated on the basis of race, a court should consider “the totality of the relevant facts.” Hernandez, 500 U.S. at 363, 111 S.Ct. 1859 (quoting Washington v. Davis, 426 U.S. 229, 242, 96 S.Ct. 2040, 48 L.Ed.2d 597 (1976)).
Thompson only hints at three possible reasons the government’s justifications could be pretext for purposeful racial discrimination. First, Thompson points to the relatively high percentage of black potential jurors struck by the prosecutor— here 71%. This fact by itself, while certainly relevant, does not establish purposeful discrimination.[15]
*298 Second, Thompson argues that because the prosecutor treated similarly-situated jurors of a different race unequally, the prosecutor’s race-neutral justification should be viewed as pretext for purposeful discrimination. The Supreme Court has recently endorsed such a side-by-side analysis.[16] Of the five black prospective jurors challenged, Thompson has, however, only sought comparison of Juror 4 with other non-black jurors in an effort to show discrimination. We accordingly limit our side-by-side comparison analysis to Juror 4.
As discussed above, the government on two race-neutral justifications in striking Juror 4. First, it struck her on the basis of demeanor, observing that “throughout the case, she sat there ... looking] perturbed throughout the whole process.” Second, the government striking Juror 4 because “her son was arrested for selling weed.” In response, Thompson contends that the venire “multiple white jurors who that family members had been subject to criminal convictions and/or arrests” and who were not similarly struck.
The district court considered Jurors 7, 40, and 44 as potential similarly situated non-black jurors whom the government failed to strike.[17] The government also urged the court to use Juror 16, also a black female with a family member of a criminal offense (armed as the proper basis for comparison. The government justified its decision not to strike Juror 16, because, unlike Juror 4, Juror 16 did not have a perturbed demean-or: “Based [on] ... her demeanor [in] the courtroom, the government chose not to strike her.They are quite similar in their background. One sat there, looked pained and bothered. One did not.”
In justifying its decision not to strike Jurors 7, 40, and 44, the government noted that, as a general matter, those jurors did not share Juror 4’s demeanor: “Those jurors did not sit there looking bothered and pained to be here.” In fact, government pointed out that it would have struck Juror 7 if Thompson had not done so first. The government thought Juror 44 “never would have come into play,” presumably because a jury would have already been selected before reaching him. The did not provide any additional specific justification for its decision not to strike Juror 40. The district court found the government’s explanation to be
This side-by-side comparison does not reveal that the government purposefully discriminated in striking Juror 4. The comparison between Jurors 4 and 16 is persuasive. If its justification for striking Juror 4 was pretextual, one would expect it to have used the same justification to strike Juror 16, which it did not. The discussion of Jurors 7, 40, and 44 in the record similarly does not compel us to find purposeful discrimination.
*299 Of course, in determining whether the government’s justification was in fact pre-textual, the district court had access to other relevant factors that cannot be judged from a cold record: The court witnessed the voir dire and was able to assess the prosecutor’s credibility. Thompson has not and cannot point to anything in the record that shows that the court committed clear error.
Finally, Thompson argues that Snyder v. Louisiana, 552 U.S. 472, 128 S.Ct. 1203, 170 L.Ed.2d 175 (2008), entitles him to succeed on his Batson challenge. Specifically, he urges that if a prosecutor, in response to a Batson challenge, justifies its use of a peremptory challenge solely on the juror’s demeanor, Snyder requires the district court to state its assessment of demeanor on the record.
Before we address Thompson’s claim, a discussion of Snyder is instructive. There, the prosecution struck all five of the , prospective black jurors who remained on the thirty-six-member venire. In justifying his decision to strike Jeffrey Brooks, a black juror, the prosecutor offered two race-neutral explanations: (1) “[T]he main reason is that he looked very nervous to me throughout the questioning;” and (2) “[H]e’s one of the fellows that came up at the beginning [of voir dire] and said he was going to miss class. He’s a student teacher. My main concern is ... that he might, to go home quickly, come back with guilty of a lesser verdict so there wouldn’t be a penalty phase.” Id. at 478, 128 S.Ct. 1203. The trial court found that Snyder had not established purposeful discrimination and denied his Batson challenge. See State v. Snyder, 750 So.2d 832, 841 (La.1999).
The Supreme Court reversed the conviction, finding that the trial court had committed clear error in rejecting Snyder’s Batson objection. The Court began its discussion by reaffirming the principle it had announced in Hernandez: “[Deference is especially appropriate where a trial judge has made a finding that an attorney credibly relied on demeanor in exercising a strike.” Snyder, 552 U.S. at 479, 128 S.Ct. 1203. Because “[t]he trial judge was given two explanations foi the strike,” and “the trial judge simply allowed the challenge without explanation,” however, “the record [did] not show that the trial judge actually made a determination concerning [the juror’s] demeanor.” Id. In a case in which two race-neutral justifications have been advanced, “[i]t is possible that the judge did not have any impression one way or the other concerning [the juror’s] demean- or.” Id. Therefore, because of this ambiguity in the record, the Court could not presume that “the trial judge credited the prosecutor’s assertion that [the juror] was nervous.” Id.
The Snyder Court’s holding, furthermore, depended on its conclusion that the prosecution’s second reason for the strike was “suspicious,” “implausible],” and “pre-textual.”[18] Id. at 482-83, 485, 128 S.Ct. 1203. Consequently, the Court concluded that “in light of the circumstances here— including [the] absence of anything in the record showing that the trial judge credited the claim that [the juror] was nervous, the prosecution’s description of both of its proffered explanations as ‘main con-cernís],’ and the adverse inference [arising *300 from the pretextual second justification]— the record does not show that the prosecution would have preemptively challenged [the juror] based on his nervousness alone.” Id. at 485, 128 S.Ct. 1203 (citation omitted).
Thompson urges that Snyder should be extended to his facts: where the prosecutor has offered only a demeanor-based justification and the district court, though crediting the prosecutor’s justification, has not made any specific findings of the juror’s demeanor on the record. Thompson contends that these demeanor-based justifications are “subject to abuse” and are “not easily reviewed.”
The circuits have disagreed on the extent to which Snyder imposes an affirmative duty on the district court to make record findings where the prosecutor has offered only a demeanor-based justification. The Seventh Circuit has read Snyder to impose an obligation on the court to make record findings, following a Batson challenge, where a prosecutor justifies the strike solely on the basis of the juror’s demeanor. See United States v. McMath, 559 F.3d 657, 665-66 (7th Cir.2009). In McMath, the district court “did not indicate whether it agreed that Juror 7 had an unhappy expression on his face, did not indicate whether this expression was unique to Juror 7 or common to other jurors, and made no evaluation of the prosecutor’s credibility.” Id. at 666 (emphasis added). The district court merely denied the Batson challenge. Id. In justifying its decision to remand for an eviden-tiary hearing, the Seventh Circuit noted that “Synder makes clear that a summary denial does not allow us to assume the prosecution’s reason was credible; rather the district court’s silence leaves a void in the record that does not allow us to affirm the denial.” Id. McMath did not, however, specify what district-court findings would have been sufficient to have met its Batson obligations.[19]
The Eleventh Circuit, on the other hand, has not read Snyder to impose any obligation to make record findings in this situation. See United States v. Prather, 279 Fed.Appx. 761, 767 (11th Cir.2008) (per curiam). As that court explained, “The Supreme Court did not reverse Snyder’s conviction because the district court had failed to explain itself clearly, but because it was unclear whether the district court’s finding rested on a plausible or implausible explanation for the strike.” Id.
We agree with the Eleventh Circuit that Snyder does not require a district court to make record findings of a juror’s demeanor where the prosecutor justifies the strike based on demeanor alone. This requirement would severely undercut the Supreme Court’s repeated observation that the third step of Batson depends on an assessment of the prosecutor’s credibility. See Hernandez, 500 U.S. at 365, 111 S.Ct. 1859.
Furthermore, the Supreme Court itself appears to read Snyder that way. In a habeas corpus case, a panel of this court addressed circumstances in which two different trial judges had presided over voir dire and the second judge, who credited the government’s demeanor-based justification, had never personally viewed the prospective juror at issue. See Haynes v. Quarterman, 561 F.Sd 535, 537 (5th Cir.2009). The panel found that “clearly established” Supreme Court precedent required a trial court to conduct, on the record, a “ ‘factual inquiry’ or ‘sensitive’ *301 inquiry into the demeanor-based reasons” for the strike. Id. at 541.
The Supreme Court reversed, Thaler v. Haynes, 559 U.S. 43, 130 S.Ct. 1171, 175 L.Ed.2d 1003 (2010), deciding that none of its “clearly established” precedent had created an obligation on a district court to make record findings of a juror’s demean- or. Id. at 49, 130 S.Ct. 1171. The Court found the panel’s reliance on Snyder to be misplaced: “In holding that respondent is entitled to a new trial, the Court of Appeals cited two decisions of this Court, Batson and Snyder, but neither ... held that a demeanor-based explanation for a peremptory challenge must be rejected unless the judge personally observed and recalls the relevant aspect of the prospective juror’s demeanor.” Id. at 47, 130 S.Ct. 1171.
It is true that Haynes establishes only that no Supreme Court decision “clearly established” the rule advanced by Thompson. Because AEDPA’s[20] limitation of “clearly established” Supreme Court precedent does not apply to our review on direct appeal, we could adopt the Haynes panel’s reasoning in the instant case. For the reasons discussed above, however, we respectfully take a different view of Snyder.
Furthermore, requiring district courts to make record findings of jurors’ demean- or would not be workable. A district court, unlike the attorneys, may not always be a position to observe and record a potential juror’s demeanor. Of course, if the district court has had the opportunity to observe and note a juror’s demeanor, and the prosecutor justifies its strike based on demeanor, it would be better practice for the court to put its findings on the record. But Snyder does not require that.
In this case, the prosecutor justified striking two black jurors—Jurors 23 and 37—solely on the basis of their demeanor. For Juror 23, the district court found “the government’s explanation credible.” For Juror 37, the court made record findings on his demeanor: “I will say for the record that I did notice [Juror] 37 sort of looking up to the ceiling.”
Unlike the records in Snyder and McMath, the record before us makes clear that, for both jurors, the district court found the prosecutor’s demeanor-based justification credible. Furthermore, unlike the prosecutor in Snyder, the prosecutor here did not offer a second, suspect justification for either juror. Snyder requires no more. There is no reversible error in the district court’s failure to make further record findings on Juror 23’s demeanor.
III.
Challenging the sufficiency of the evidence to convict, Thompson appeals the denial of his motion for a judgment of acquittal. See Fed.R.CRIm.P. 29(a). We review the denial de novo. United States v. Greer, 137 F.3d 247, 249 (5th Cir.1998). We consider the evidence, all reasonable inferences drawn from it, and all credibility determinations in the light most favorable to the government, and we affirm if a reasonable jury could find the offense’s essential elements proven beyond a reasonable doubt. See United States v. Mulderig, 120 F.3d 534, 546 (5th Cir.1997). Reviewing the sufficiency of the evidence is not about whether the outcome was correct but merely whether the verdict was reasonable. United States v. Williams, 264 F.3d 561, 576 (5th Cir.2001).
The government presented three witnesses who testified to Thompson’s role in the conspiracy. Albert Kelly stated that *302 Thompson worked as a “runner,” delivering crack and picking up money. Kelly also testified to the joint drug-related activities of the witnesses and Thompson. He stated that weapons were accessible to the conspiracy members at all of the locations where they met, including Thompson’s house, and that Thompson was known as a “trigger man,” someone who was known to have a gun during drug trafficking.
Gemayal Pipkins testified to Thompson’s involvement in the conspiracy, explaining that Thompson was sometimes present during sales, carrying weapons as a “show of force” or participating in other drug-related activities. Pipkins also testified to having seen Thompson carrying one of the specific rifles that was introduced into evidence.
Lawrence Cavelier, a self-proclaimed drug runner for the conspiracy, testified that although he did not run drug errands for Thompson, he did personal errands for him and was paid with crack. Cavelier also talked about taking drug tools for cooking cocaine over to Thompson’s house.
Thompson disputes that the evidence was sufficient under the conspiracy charge. Specifically, he claims there was no evidence connecting him to the conspiracy other than the testimony of the co-conspirators.
 A drug conspiracy requires evidence of “(1) the existence of an agreement between two or more persons to violate [the] narcotics laws; (2) the defendant’s knowledge of the agreement; and (3) the defendant’s voluntary participation in the agreement.” United States v. Gonzalez, 76 F.3d 1339, 1346 (5th Cir.1996). Contrary to Thompson’s suggestion, “[a]s long as it is not factually insubstantial or incredible, the uncorroborated testimony of a co-conspirator, even one who has chosen to cooperate with the government in exchange for non-prosecution or leniency, may be constitutionally sufficient evidence to convict.” United States v. Medina, 161 F.3d 867, 872-73 (5th Cir.1998) (internal quotation and citation omitted).
Kelly, Pipkins, and Cavelier testified to Thompson’s role in the drug-trafficking scheme. Thompson does not point to any ways in which their testimony was “factually insubstantial or incredible.” This evidence is sufficient: A rational trier of fact could find Thompson was a voluntary participant in a drug conspiracy.
Thompson dispute that the evidence was sufficient to convict him of possession of a weapon in furtherance of the drug-trafficking charge. To this end, he maintains that “no one puts a weapon in Mr. Thompson’s hand or in immediate proximity to him.”
Section 924(c)(1)(A) imposes a criminal penalty on “any person who, during and in relation to any crime of violence or drug trafficking crime ... uses or carries a firearm, or who, in furtherance of any such crime, possesses a firearm.” 18 U.S.C. § 924(c)(1)(A). Where, as here, a defendant is charged under the possession prong of this statute, “the appropriate standard of participation is ‘in furtherance of a crime.” United States v. McGilberry, 480 F.3d 326, 329 (5th Cir.2007).
Contrary to Thompson’s assertion, testimony demonstrates that Thompson owned, carried, and used weapons in furtherance of the conspiracy. Per the testimony of DEA Agents Salvador Scalia and Jamey Tarrh, Thompson, shortly after being arrested, admitted to owning a loaded assault weapon found near the seized crack cocaine and money. Kelly and Pipkins also testified that Thompson carried a weapon during drug deals. In fact, Thompson was known as a “trigger man.” *303 Furthermore, Pipkins testified that Thompson used those weapons as part of-a “show of force.” Physical evidence further corroborated that testimony. The evidence is sufficient: A rational jury could find that Thompson possessed firearms in furtherance of a drug-trafficking crime. See United States v. Ceballos-Torres, 218 F.3d 409, 415 (5th Cir.2000).
The judgment of conviction is AFFIRMED.

.References to a juror's demeanor include any of the following observations: a juror's looking at, acknowledging, or smiling at one party but not the other; a juror's inattentiveness, or attentiveness to one side but not the other; a juror’s lack of eye contact; a juror who exaggerates; a juror’s apparent nervousness; a juror who exhibits a hostile demeanor; a juror's physical appearance; and a juror’s facial expressions. See Kevin F. O'Malley, Jay E. Grenig & Hon. William C. Lee, 1 Federal Jury Practice and Instructions § 4:9 (6th ed.2013) (citing cases).

. The government noted that Juror 23 “sat there, looking disinterested and annoyed. He was stern when he was awake. His arms were folded.” The government similarly noted that Juror 37 "sat there, looking lost. He did something like this — indicates—with his— my sense is he was lost and wasn't engaged.” The record does not further clarify what gesture the government claims Juror 37 made.

. The government noted that Juror 4 "throughout the case ... sat there ... look[ing] perturbed throughout the whole process.” The government likewise observed that Juror 25 "sat there with his arms folded *295 ... wearing a mean look on his face.” The government noted that "one of [its] agents said that [Juror 25] had glared at [the agent].” The government also noted Juror 26’s demeanor as a basis to strike: "In addition, I mean, the demeanor, when he sat there, looking down. And we actually saw him smirk at one point in response to an answer that someone else made.”

. The government additionally justified striking Juror 4 because "her son was arrested for selling weed.” The government was consequently "concern[ed] with, her sympathizing with the defendant here on trial.” Likewise, the government additionally justified striking Juror 25 for his prior incident with law enforcement: "[W]hen he was brought up to the stand, he told the judge that he had been arrested and had spent the night in jail on a contraband use charge.” According to the government, "the explanation he gave' was it was his right to do it. So there was a conflict of whether he felt he should have been in jail, could have harbored some resentment against the government.” In addition to his demean- or, the government struck Juror 26 because he was employed as a postal server. Because the U.S. Attorney’s Office prosecutes post office employees, the government claimed to have "had problems with them in the past as jurors.”

. Defense counsel disagreed with the government’s observation of Juror 4’s demeanor: "I did not observe the characteristics that Mr. Carter displayed.” Defense counsel likewise disagreed with Juror 23’s demeanor: "I did not observe these characteristics of No. 23. He did seem an honest, intelligent man, who has currently served as an organist at his church.” Similarly with Juror 25’s demean- or: "I looked at the same gentleman. I did not notice him glaring at the agent at all.” And Juror 26: "And, again, we have a smirk, we have an awe, we have a glare. It’s all pretextual type innuendo, which every last juror if you look may have sneezed or yawned or made a facial expression. Therefore, all of these challenges are not valid for race.” And, finally, a similar disagreement with an assessment of Juror 37’s demeanor: "I did not notice him.glaring or looking.”

. Defense counsel also indicated that the government's second rationale with respect to Juror 4 applied to other white jurors who were not struck: "Additionally, there were multiple white jurors who indicated that family members had been subject to criminal convictions and/or arrests. Those jurors were . not subject to the same strikes." For Juror 26, defense counsel argued that there was no indication on the record that he was biased on account of his position as a postal employee: "[T]here was no question asked in this session or in any part of the voir dire process when you addressed whether the potential juror was disposed or biased as a postal employee. There was no reference to him or anyone in his immediate circle being a victim of an investigation and/or conviction.”

. For Juror 19, defense-counsel observed that he “was not engaged ... not necessarily disinterested, but didn’t seem to follow the direction and the instruction in a way that he was engaged in the jury selection process.” Similarly, defense counsel "didn’t find [Juror 30] to be paying close attention and following.” Likewise, contrary to the government's assessment, defense counsel “didn't see [Juror 36] acting and following closely as the other ones, the other jurors in that particular panel were.”

. The district court rejected defense counsel’s justifications for striking Jurors 17 and 20. For Juror 17, defense counsel “felt that she would have superior ability to influence the potential jurors based on her status as an administrator at Delgato [sic] Community College.” For Juror 20, defense counsel believed that "as a potential homemaker, that, if the trial were to last longer than two days, perhaps it would be an inconvenience on her.”

. Because Thompson did not raise this issue on appeal, we consider the argument to be waived. United States v. Thames, 214 F.3d 608, 611 n. 3 (5th Cir.2000).

. See also Hernandez, 500 U.S. at 367, 111 S.Ct. 1859 ("[I]f an appellate court accepts a trial court’s finding that a prosecutor's race-neutral explanation for his peremptory challenges should be believed, we fail to see how the appellate court nevertheless could find discrimination. The credibility of the prosecutor's explanation goes to the heart of the equal protection analysis, and once that has been settled, there seems nothing left to review.”).

.See Snyder v. Louisiana, 552 U.S. 472, 478, 128 S.Ct. 1203, 170 L.Ed.2d 175 (2008) ("[T]he Constitution forbids striking even a single prospective juror for a discriminatory purpose.” (internal quotation marks and citation omitted)).

. See Hernandez, 500 U.S. at 359, 111 S.Ct. 1859 ("Once a prosecutor has offered a race-neutral explanation for the peremptory challenges and the trial court has ruled on the ultimate question of intentional discrimination, the preliminary issue of whether the defendant had made á prima facie showing becomes moot.”); United States v. Broussard, 987 F.2d 215, 220 n. 4 (5th Cir.1993).

. Technically, the government also justified striking Juror 37 by expressly stating that its decision was not motivated by considerations of race: "It had nothing to do with racism.” Courts do not, however, give any weight to these types of disavowals of racial motivations. See Batson, 476 U.S. at 98, 106 S.Ct. 1712 ("Nor may the prosecutor rebut the defendant’s case merely by denying that he had a discriminatory motive or ‘affirm[ing] [his] good faith in making individual selections.’ ”) (quoting Alexander v. Louisiana, 405 U.S. 625, 632, 92 S.Ct. 1221, 31 L.Ed.2d 536 (1972)).

. This court has routinely found demeanor to be . a race-neutral justification. See, e.g., United States v. Turner, 674 F.3d 420, 436 (5th Cir.2012) ("We have specifically approved of eye contact, or the lack thereof, as a valid neutral explanation.”); Moore v. Keller Indus., Inc., 948 F.2d 199, 202 (5th Cir.1991) ("We also have found ‘disinterested demeanor' and ‘inattentiveness’ to be valid, race-neutral reasons for peremptory strikes.”).

. See Miller-El v. Cockrell, 537 U.S. 322, 331, 123 S.Ct. 1029, 154 L.Ed.2d 931 (2003) ("91% of the eligible black jurors were removed by peremptory strikes. In contrast the prosecutors used their peremptory strikes against just 13% (4 out of 31) of the eligible nonblack prospective jurors qualified to serve on petitioner’s jury. These numbers, while relevant, are not petitioner’s whole case.”).

. See Miller-El v. Dretke, 545 U.S. 231, 241, 125 S.Ct. 2317, 162 L.Ed.2d 196 (2005) ("If a prosecutor's proffered reason for striking a black panelist applies just as well to an nonblack who is permitted to serve, that is evidence tending to prove discrimination to be considered at Batson's third step.”).

. Thompson’s brief does not specifically re-fer to any set of jurors as the appropriate comparison group, only vaguely referencing "[mjultiple white jurors.” During oral defense counsel, for the first time, that Juror 4 should be compared to Jurors 2, 7, 12, and 31. In light of the briefing on this issue, we consider counsel to have waived any argument that Juror 4 should be compared to Jurors 2, 12, and 31. See United States v. Beaumont, 972 F.2d 553, 563 (5th Cir.1992).

. The Supreme Court found three persuasive reasons to believe the prosecutor's second justification was pretextual: (1) the brevity of the trial, (2) the juror's lessened concern upon his dean's assurances that any interruption would not cause a problem, and (3) the prosecutor did not challenge similarly-situated white jurors who had more onerous conflicts. See id. at 482-84, 128 S.Ct. 1203.

. McMath, 559 F.3d at 666 (“We thus conclude that the district court clearly erred in denying the Batson challenge without making findings regarding the credibility of the proffered race-neutral justification for the strike.’’).

. See the Antiterrorism and Effective Death Penalty Act of 1996 (“AEDPA").