# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**F I L E D**
May 18, 2011

Lyle W. Cayce
Clerk

No. 09-10529

ROBERT CHARLES MORRIS,

Petitioner-Appellant,

v.

RICK THALER, DIRECTOR, TEXAS DEPARTMENT OF CRIMINAL
JUSTICE, CORRECTIONAL INSTITUTIONS DIVISION,

Respondent-Appellee.

Appeal from the United States District Court
for the Northern District of Texas, Fort Worth Division
4:08-cv-148-a

Before GARWOOD, ELROD, and SOUTHWICK, Circuit Judges.

PER CURIAM:[*]

Robert Charles Morris, Texas prisoner # 1811083, appeals the dismissal of his petition for habeas corpus under 28 U.S.C. § 2254 challenging his Texas conviction for indecency with a child by contact. This court granted a certificate of appealability (COA) to review whether the ineffectiveness of trial counsel rendered Morris's guilty plea involuntary. Proper disposition of Morris's petition requires the court to resolve a number of material factual disputes which turn

[*] Pursuant to 5th Cir. R. 47.5, the court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in 5th Cir. R. 47.5.4.

No. 09-10529

on credibility determinations. Therefore, we reverse the judgment of the district court and remand the petition for an evidentiary hearing and further proceedings consistent with this opinion.

I.

On December 8, 2004, Morris submitted to a polygraph examination conducted by Immigration and Customs Enforcement (ICE) on an unrelated matter. Morris was informed at the outset of his rights under *Miranda v. Arizona*, 384 U.S. 436 (1966), and signed a written waiver of those rights, as well as a polygraph consent form. During the six-hour examination, questions arose about Morris's sexual contact with minors. According to Morris, when the polygraph results allegedly indicated deception, Morris stated that he would not answer any more questions and expressed a desire to leave, but was not allowed to do so. Morris maintains that he confessed only after officials made threats against him and his family. He asserts that during those six hours he was not allowed to leave or walk around without an escort.

Subsequently, ICE officials informed the Mineral Wells police of Morris's confession. On January 4, 2005, Morris was at the police station complex on unrelated business when Officer Watts approached him. The parties' accounts of what happened next differ markedly.

Respondent asserts that Watts asked to speak with Morris about the statements he made during the polygraph examination. Morris agreed, and voluntarily accompanied Watts to his office, which was in the building. Watts claims that Morris remained "in [his] office of his own free will and was able to leave at any time." Watts then shared the information ICE had given him from polygraph and asked Morris if he would be willing to discuss it. When Morris agreed, Watts "gave Mr. Morris his Constitutional Rights" and Morris signed a written waiver of those rights. Watts began to question Morris about the incidents of sexual contact with minors he had divulged during the polygraph.

2

No. 09-10529

Morris "was very forthcoming with the information" and, consequently, Watts was able to elicit the details with "very little questioning." At no time during the questioning did Morris ask to leave or to consult with an attorney. He proceeded to recount two episodes of sexual contact with M.J., a minor. Watts then prepared a written statement setting forth Morris's account of these two episodes, which Morris signed. After signing the statement, Morris left.

Morris, on the other hand, asserts that he had no choice about speaking to Watts. When Watts first approached Morris at the station, Watts blocked the exit door and threatened to call Morris's probation officer until Morris agreed to talk with him. Morris followed Watts to his office, and Watts shut the door. Watts told him that nothing he said would be used against him. Without advising Morris of his *Miranda* rights, Watts questioned Morris about the previously provided confession and elicited additional information. When the interview ended, Morris attempted to leave, but Watts advised him that he needed a statement first. Watts then read Morris his *Miranda* rights and had him sign a written waiver of those rights. From that point on, although Watts continued to ask Morris questions, "Morris remained silent." Watts then proceeded to type out a written statement based on Morris's pre-*Miranda* admissions. Watts insisted that Morris sign the statement before he could leave, assuring him once again that it would not be used against him. Once Morris had signed the statement, Watts told him that he was free to leave. Watts used that information to locate the victim and obtain a statement from her about the assault.

In February 2005, Jimmy Ashby was appointed to represent Morris on a charge of aggravated sexual assault of a child. At a meeting with Ashby later that month, Morris told him about what had transpired at the polygraph examination and, later, in Watts's office. In particular, Morris claims that he relayed all of the  details of his encounter with Watts, including the fact that

Watts prevented him from leaving without giving a statement. According to Morris, Ashby responded, "It's the government; they can do what they want. They are going to find you guilty. My job is to get you the best deal possible." Ashby's affidavit, filed with the federal habeas court, does not directly dispute any of this. It merely asserts that "Morris never denied having received the *Miranda* warnings prior to his signing the statement on January 4, 2005." It makes no mention of whether any questioning took place before the warnings were given, or whether Watts made contemporaneous verbal statements which were inconsistent with the written warnings that Morris signed. Likewise, it does not address whether Watts told Morris that he could not leave without signing the statement.

Ashby attached to his affidavit a letter from Morris dated April 29, 2005. Ashby describes the letter as a "summary of the complaints voiced to me by Morris." The letter itself does not purport to be an exhaustive summary of Morris's complaints. Rather, it appears to concern questions that arose as Morris was reviewing discovery material provided by the prosecution: "I have spent some time going over the discovery information provided by the District Attorney and I have noticed some things and continue to have questions about this." The letter proceeds to raise issues regarding the police incident report, the polygraph examiner's report, and the written statement from the victim. The letter contains no discussion of Morris's encounter with Watts or the written statement that resulted from it.

Ashby did not file a motion to suppress Morris's written statement or that of the victim, who was identified based on Morris's statement. Instead, Ashby negotiated a plea bargain with the prosecutor: 12 years of imprisonment for the lesser-included offense of indecency with a child by contact. According to Morris, Ashby advised him to plead guilty, warning him that if he did not accept the offer, he "would get life." As Morris put it, "Ashby said that it was either 12

years or at least 50-60 years at trial and they will get it." Morris ultimately accepted the plea offer, and the state trial court sentenced him to 12 years of imprisonment, consistent with the agreement.

Morris filed a state postconviction application, asserting that Ashby rendered ineffective assistance by failing to communicate with Morris, failing to investigate the case, not spending sufficient time on the case, and forcing Morris to plead guilty; that his confession resulted from a violation of the privilege against self-incrimination, custodial interrogation, and threats against him and his family; that the trial court failed to replace trial counsel despite Morris's complaints; that Morris was denied access to the courts; and that his guilty plea was involuntary. The state trial court did not hold an evidentiary hearing. In a one-page order, the court recommended that relief be denied after finding "no controverted, previously unresolved facts material to the legality of the Petitioner's confinement." The order contained no express factual findings regarding Morris's claims. The Texas Court of Criminal Appeals denied relief without written order.

Morris then filed this federal habeas petition under 28 U.S.C. § 2254, raising essentially the same claims that he had presented in his state application. The district court ordered additional briefing on "whether Morris's trial counsel rendered ineffective assistance by failing to pursue a motion to suppress and/or failing to inform Morris of the viability of a motion to suppress." In support of its arguments that Ashby was not ineffective, respondent submitted affidavits from Ashby and Watts. Rather than hold an evidentiary hearing to resolve the conflicting evidence, the district court denied relief on the basis of the paper record. The court concluded that if Morris's allegations were true, "there is a reasonable probability, had Ashby made a motion to suppress" Morris's statement and the victim's statement, the motions would have been successful, resulting in the exclusion of that evidence. Based on the paper

record, however, the court determined that Morris's claims were "unfounded." In making this determination, the court found especially significant the fact that Morris's April 29, 2005 letter to Ashby contained no allegations of improper conduct by Watts during the interrogation in his office.

Morris timely appealed the district court's ruling. We granted a COA to review whether the ineffectiveness of trial counsel rendered Morris's guilty plea involuntary.

## II.

Because Morris's claims were rejected on the merits by the state court's denial of Morris's postconviction application, we must defer to the state court's adjudication unless it was "contrary to" or an "unreasonable application of" clearly established federal law as determined by the Supreme Court. *See* 28 U.S.C. § 2254(d). To find an unreasonable application of federal law, this court must determine that the state court's ruling was objectively unreasonable and not simply erroneous or incorrect. *Williams v. Taylor*, 529 U.S. 362, 411 (2000). We review the district court's findings of fact for clear error and its conclusions of law *de novo*. *Martinez v. Johnson*, 255 F.3d 229, 237 (5th Cir. 2001).

## A.

A valid guilty plea waives all nonjurisdictional defects that occurred prior to the plea, unless the claim affects the voluntariness of the plea. *Smith v. Estelle*, 711 F.2d 677, 682 (5th Cir. 1983). Morris contends that his guilty plea was rendered involuntary as a result of Ashby's ineffective assistance. According to Morris, Ashby did not file a motion to suppress the central evidence in the prosecution's case, and did not advise Morris that such a motion would be meritorious. Instead, he advised Morris that if he insisted on going to trial, he would be found guilty and effectively receive a life sentence.

A petitioner claiming ineffective assistance of counsel must show that: (1) his attorney's performance fell below an objective standard of reasonableness,

and (2) there is a reasonable probability that, but for his counsel's unprofessional errors, the result of the proceeding would have been different. *Strickland v. Washington*, 466 U.S. 668, 687-88, 694 (1984). A reasonable probability means "a probability sufficient to undermine confidence in the outcome." *Id*. at 694. The Supreme Court has applied the two-prong *Strickland* analysis to ineffective-assistance claims arising during the plea process. *Hill v. Lockhart*, 474 U.S. 52, 58-59 (1985). In this context, the prejudice inquiry "focuses on whether counsel's constitutionally ineffective performance affected the outcome of the plea process." *Id*. at 59. The petitioner bears the burden of demonstrating that "there is a reasonable probability that, but for counsel's errors, he would not have pleaded guilty and would have insisted on going to trial." *Id*.

Respondent asserts that Morris cannot establish prejudice because "Morris never alleged to either the state court or the district court below that, but for counsel's errors, he would have changed his plea and proceeded to trial." Respondent is wrong. Morris's federal habeas petition asserts that his guilty plea was rendered involuntary by counsel's various deficiencies, including his "omissions of possible suppression issues." Because Ashby advised Morris that the would be found guilty and receive a lengthy sentence if he did not accept the plea offer, "[Morris] felt he had no choice but to plead guilty." His petition unequivocally states that "he would not have pleaded guilty had he known about the possibility of the evidence being suppressed." Likewise, in his state postconviction application, Morris asserted that Ashby was ineffective for failing to file a motion to suppress and that, because of counsel's ineffectiveness, he "felt [he] had no choice but to plea[d] guilty even though he did not want to and go to trial."

Along the same lines, Respondent asserts that the district court found that Morris had failed to allege prejudice. Respondent mischaracterizes the district court's order, however, by taking the statement out of context. The district court

was addressing Morris's ineffectiveness claim based on Ashby's "lack of communication, outside of the context of a motion to suppress." In fact, the court specifically cabined its finding: "*Aside from the issues raised in Section II.B*, Morris does not allege that, but for counsel's actions, he would not have pleaded guilty and instead would have gone to trial." Section II.B, of course, addressed Morris's ineffectiveness claims relating to Ashby's failure to file a suppression motion. The claims of Ashby's failure to communicate with Morris—the actual subject of the district court's factual finding—are not before us on appeal, as this court denied a COA as to these claims. Indeed, as to the claims actually before us, the court made precisely the opposite finding as that urged by respondent: "Morris contends that, had his counsel, Jim Ashby, informed him that there was a viable motion to suppress the evidence against him, he would not have pleaded guilty."

Having disposed of respondent's preliminary and utterly baseless grounds for rejecting Morris's claim of prejudice, we proceed to analyze Morris's allegations under the framework of *Strickland* and *Hill*. In this case, both the deficient performance and prejudice prong turn upon the viability of a motion to suppress the fruits of Watts's interrogation of Morris. After all, counsel cannot be deficient for failing to make "futile motions or objections." *Koch v. Puckett*, 907 F.2d 524, 527 (5th Cir. 1990). Likewise, if the motion were doomed to fail, Morris cannot show that Ashby's failing to pursue the motion "affected the outcome of the plea process." *Hill*, 474 U.S. at 59. Thus, we must consider Watt's interrogation.

## B.

The "now-familiar procedural safeguards" set forth in *Miranda* "protect an accused's Fifth Amendment privilege against self-incrimination during custodial interrogation." *Gachot v. Stalder*, 298 F.3d 414, 418 (5th Cir. 2002) (internal citation omitted). A valid waiver of the right to remain silent under *Miranda*

has two elements: "(1) the relinquishment of the right must be 'voluntary in the sense that it was the product of a free and deliberate choice'; and (2) the waiver must be made with 'full awareness of the right being abandoned' and the consequences of doing so." *Soffar v. Cockrell*, 300 F.3d 588, 592 (5th Cir. 2002) (en banc) (quoting *Moran v. Burbine*, 475 U.S. 412, 421 (1986)).  "Failure to administer *Miranda* warnings creates a presumption of compulsion." *Oregon v. Elstad*, 470 U.S. 298, 307 (1985).

Morris advances two theories regarding why the fruits of his interrogation by Watts would have been suppressed.  First, he argues that even if he was not subjected to custodial interrogation, his written statement was involuntary because "[e]ven before Morris signed the written statement[,] he was told the statement would not be used against him."  Second, he argues that he was in fact subjected to a custodial interrogation.  Thus, he was entitled to *Miranda* warnings at the outset of questioning.  Yet, he claims he did not receive the warnings until after he had given a full confession, when he was asked to sign a written statement which consisted of his unwarned pre-*Miranda* statements.  Because this statement was tainted by the unwarned confession, which is presumed to have been compelled, he argues that it would have been suppressed.  We consider each theory in turn.  For the purposes of this analysis, we will presume the truth of Morris's allegations.

A motion to suppress based on Morris's first theory—that regardless of whether the interrogation was custodial, Watts's verbal assurances that the written statement could not be used against Morris rendered the written statement involuntary—would have been very likely to succeed, as the district court recognized. *See United States v. Rogers*, 906 F.2d 189, 192 (5th Cir. 1990) (holding that a confession induced by an assurance of no prosecution is not voluntary); *Streetman v. Lynaugh*, 812 F.2d 950, 957 (5th Cir. 1987) ("[C]ertain promises, if not kept, are so attractive that they render a resulting confession

9

No. 09-10529

involuntary. . . . A promise of immediate release or that any statement will not be used against the accused is such a promise."); *see also Sossaman v. State*, 816 S.W.2d 340, 345 (Tex. Crim. App. 1991), *abrogated on other grounds by Graham v. State*, 994 S.W.2d 651 (Tex. Crim. App. 1999). Indeed, assuming the truth of Morris's allegations, respondent concedes as much, but argues that Morris never presented this theory to the state court and, therefore, this court is barred from reviewing it because it is unexhausted.

According to respondent, in the state application, Morris claimed that Watts promised him only that his oral statement, as opposed to the written statement, could not be used against him. Morris's state application does not make any such clear distinction, however. Morris alleged that "[w]hen the questioning began," Watts "stated noting [sic] would be used aginst [sic] the applicant." The statement that *nothing* could be used against Morris could fairly be understood to encompass both oral statements and written statements. Moreover, as respondent points out, Morris's state application cited a number of cases holding that such threats made by police officers may render a confession involuntary. Thus, contrary to respondent's assertion, Morris's involuntary-confession theory suffers from no exhaustion problem, as it was fairly presented to the state court. *See Fisher v. Texas*, 169 F.3d 295, 303 (5th Cir. 1999) ("[T]he applicant need not spell out each syllable of the claim before state court" in order to meet the exhaustion requirement.).

As to Morris's second theory, under the Supreme Court's decision in *Elstad*, an unwarned admission does not always taint a subsequent warned statement. Such factors as "the time that passes between confessions, the change in place of interrogations, and the change in identity of the interrogators all bear on whether [the] coercion has carried over into the second confession." *Elstad*, 470 U.S. at 310. Applying that test here, if Watts used the custodial interrogation procedure alleged by Morris—asking unwarned questions,

administering *Miranda* warnings, and then preparing a transcription of Morris's unwarned answers for Morris to sign—a Texas court would almost certainly have suppressed the written statement.   Confronting this precise factual scenario, the Texas Court of Criminal Appeals opined that *Miranda* "indisputably requires a law enforcement agent to give the appropriate legal warnings *before* any questioning or 'discussion interview,' not merely prior to signing a written statement after all the custodial interrogation is complete." *Jones v. State*, 119 S.W.3d 766, 775 n.16 (Tex. Crim. App. 2003) (emphasis added).   Applying the *Elstad* factors, the court concluded that the written statement was obtained in violation of the defendant's Fifth Amendment rights:

> [I]n contrast to *Elstad* where the initial unwarned statement took place at the defendant's home and the warned statement was given after transporting the defendant to the police station, the unwarned and warned statements in this case were given during a nearly undifferentiated single event, taking place in the same room as an uninterrupted and continuous process.   The written Akin statement was literally a transcription of appellant's unwarned oral statements.   Appellant did not make a second statement after he finally received his *Miranda* warnings; he simply signed the written statement that he had dictated to Akin before he was warned. To apply *Elstad* here and declare the Akin statement admissible by virtue of the late admonishment of the required warnings would undermine the spirit and intent of *Miranda*.

*Id.* at 775. Given this precedent, the only remaining question is whether Watts's questioning of Morris amounted to a custodial interrogation.   Respondent concedes that the questioning amounted to interrogation, so we need only consider whether Morris was "in custody" for purposes of *Miranda*.

Custody means formal arrest or else a scenario in which "a reasonable person in the position of the suspect would understand the situation to constitute a restraint on freedom of movement to the degree that the law associates with formal arrest." *Murray v. Earle*, 405 F.3d 278, 286 (5th Cir. 2005); *see also Herrera v. State*, 241 S.W.3d 520, 525 (Tex. Crim. App. 2007).

No. 09-10529

The custody inquiry is "often a matter of shades and degrees," requiring "a number of fact-intensive, close calls." *Thompson v. Keohane*, 516 U.S. 99, 118 (1995) (Thomas, J. dissenting). The Texas Court of Criminal Appeals has identified four general situations that may amount to custody: "(1) when the suspect is physically deprived of his freedom of action in any significant way, (2) when a law enforcement officer tells the suspect that he cannot leave, (3) when law enforcement officers create a situation that would lead a reasonable person to believe that his freedom of movement has been significantly restricted, and (4) when there is probable cause to arrest and law enforcement officers do not tell the suspect that he is free to leave." *Dowthitt v. State*, 931 S.W.2d 244, 255 (Tex. Crim. App. 1996).

The circumstances surrounding Morris's interrogation appear to rise to the level of custody. He claims that after Watts approached him at the police station, Watts physically blocked the door and prevented Morris from exiting. Morris was compelled to follow Watts to his office because of Watts's implicit threats to inform Morris's probation officer of any failure to cooperate, which would be a violation of his terms of probation and possibly result in his arrest. Once they were inside the office, Watts closed the door behind them. When Morris later attempted to end the interrogation, Watts insisted that he needed a statement before Morris could leave. Under these circumstances, in light of Watts's physical and verbal manifestations that Morris was not to depart the police station or even his office without his permission, a reasonable person would believe that his freedom of movement had been restricted to the extent normally associated with formal arrest. This conclusion is further reinforced by the fact that the threat of actual arrest—through violation of Morris's terms of probation—was used to induce Morris to follow Watts's directives. Because Morris in all likelihood was in custody at the time of the interrogation, under the

facts alleged, a suppression motion under *Jones* would most likely have been successful in the state trial court.

In short, under the facts alleged by Morris, both theories could in all likelihood have been the subject of a successful motion to suppress Morris's written confession, likely as well as the victim's statement under the "fruit of the poisonous tree" doctrine. *See Wong Sun v. United States*, 371 U.S. 471, 484 (1963). Morris claims that he apprised Ashby of all the pertinent facts regarding his interrogation. Assuming the truth of these claims, reasonably competent counsel would have filed a suppression motion, especially given the centrality of this evidence to the state's case against Morris, and would not have advised his client to plead guilty. Thus, Ashby's performance as alleged was constitutionally deficient and "fell below an objective standard of reasonableness." *Strickland*, 466 U.S. at 687-88. Moreover, Morris alleges that had Ashby informed him of the high probability of such a motion succeeding and obliterating the government's case against him, "he would not have pleaded guilty and would have insisted on going to trial." *Hill*, 474 U.S. at 59. Therefore, if all of Morris's allegations are true, the state court unreasonably applied *Strickland* and *Hill* in rejecting his application for postconviction relief.

## C.

The state court made no express factual findings on Morris's claims, and neither the state court nor the district court provided Morris an evidentiary hearing. We review the district court's denial of an evidentiary hearing for abuse of discretion. *See McDonald v. Johnson*, 139 F.3d 1056, 1060 (5th Cir. 1998). A district court need not hold a hearing so long as it "had sufficient facts before it to make an informed decision on the merits" of a petitioner's claims. *Id*. In order to be entitled to a hearing, a petitioner must show that "a factual dispute, if resolved in his favor, would entitle him to relief." *Murphy v. Johnson*,

205 F.3d 809, 816 (5th Cir. 2000).[1]  To create such a factual dispute, however, a petitioner's allegations must be more than "merely conclusory allegations unsupported by specifics." *Id.*

As previously discussed, if all factual dispute were resolved in Morris's favor, he would be entitled to habeas relief.  Moreover, contrary to the state's assertions, Morris's allegations are not conclusory.  We label allegations conclusory when they are vague, lacking in specifics, or amount to mere recitations of the relevant legal standards without any supporting factual narrative. *See, e.g.*, *id.* (rejecting allegation of a "secret undisclosed deal between the prosecutor" and a key witness as conclusory); *Clark v. Johnson*, 202 F.3d 760, 766 (5th Cir. 2000) ("Clark's allegations . . . do not involve specifics. Rather, Clark contends that 'many problems [were] discovered in autopsies conducted by Dr. Erdmann.'").  Similarly, claims which amount to "purely speculative" fishing expeditions, *Hughes v. Johnson*, 191 F.3d 607, 629 (5th Cir. 1999), or are "wholly incredible" may properly be classified as conclusory. *McDonald*, 139 F.3d at 1060 n.3.  Morris's allegations do not fit into any of these categories.  He provides a detailed, coherent, and internally consistent narrative regarding his interrogation by Watts and his interactions with his attorney, Ashby.  In this

---

[1] Although respondent has not brought *Cullen v. Pinholster*, 131 S. Ct. 1388 (2011), to our attention, we note that following that decision, a federal court must evaluate the state court's decision based on the record that was before the state court, not based on new evidence presented at a federal court hearing.  Here, the state court apparently accepted Morris's version of events, yet found relief was not warranted, as evidenced by the order denying his unopposed habeas petition, which states that there are "no controverted, previously unresolved facts material to the legality of the Petitioner's confinement."  As we have already discussed, if all of Morris's allegations are true, the state court unreasonably applied *Strickland* and *Hill* in rejecting his application for postconviction relief.  Thus, in this case a hearing is necessary not to evaluate the state court's decision, but to determine whether Morris's allegations are true.  This is the precise scenario contemplated by Justice Breyer in his concurrence: "[I]f the state-court rejection assumed the habeas petitioner's facts (deciding that, *even if* those facts were true, federal law was not violated), then (after finding the state court wrong on a (d) ground) an (e) hearing might be needed to determine whether the facts alleged were indeed true." *Id.* at 1412 (Breyer, J., concurring in part and dissenting in part).

sense, they are no more conclusory than the affidavits submitted by Watts and Ashby, which seek to contradict Morris's account.

In the particular circumstances of this case, the district court could not resolve the disputed factual issues solely by reference to the paper submissions. The district court discredited Morris's affidavit primarily on the ground that the specifics of his interrogation by Watts are not discussed in the April 29 letter he wrote to Ashby:[2] "Of particular significance to the court is that Morris's letter, while outlining seemingly every discrepancy in the State's discovery materials, never mentions that [Watts] coerced him into making a statement, promised him that his statement could [not] be used against him, or did anything to violate Morris's constitutional rights." The problem with this reasoning is that, despite Ashby's claim that Morris's April 29 letter summarized all of Morris's complaints to him, the letter itself does not purport to be such a summary. Rather, by its own terms, it is a numbered list discussing issues relating to three discovery documents—the police incident report, the polygraph examiner's report, and the written statement signed by the victim—which Morris noticed after he "spent some time going over the discovery information provided by the District Attorney." In fact, the letter does not even mention the interrogation by Watts. If the letter were truly an exhaustive summary of Morris's complaints to Ashby, one would expect it to include at least some discussion of this incident, especially because Ashby's affidavit acknowledges that Morris had complained to him about the Watts interrogation. "His complaint was that he believed that Deputy Watts had no right to inquire about matters that he had discussed during the

---

[2] The district court also relied on the fact that Morris's signature appears on a waiver of rights form and on the written statement prepared by Watts. Morris does not deny having signed these forms, however. Indeed, his arguments deal with the reasons why his statement would have been subject to suppression *despite* the fact that he signed them.

polygraph examination back in November 2004." Yet this complaint is not discussed at all in the April 29 letter.

Apart from this letter, there is no other corroborating evidence upon which the district court could rely to resolve the dispute without the need to make a credibility determination. Indeed, Ashby's affidavit does not directly deny that Morris communicated the essential facts regarding his interrogation, which now form the basis of his claim. By asserting merely that "Morris never denied having received the *Miranda* warnings prior to his signing the statement on January 4, 2005," it completely elides the key factual issues in this case. The affidavit does not discuss whether Watts made contemporaneous verbal statements which were inconsistent with the written warnings that Morris signed. Likewise, it is silent as to whether any questioning took place before the warnings were given, or whether Watts told Morris that he could not leave without signing the statement. Thus, the only evidence before the district court fails to resolve the factual disputes created by the competing affidavits filed by Morris, Ashby, and Watts.

### III.

In this case, the district court lacked sufficient undisputed facts "to make an informed decision on the merits" of Morris's claim and therefore abused its discretion in failing to conduct an evidentiary hearing. *McDonald*, 139 F.3d at 1060. The resolution of the disputed facts in this petition—facts which, if proven true, would entitle Morris to relief—ultimately require determinations of credibility. On this record, such determinations will require live testimony. *See Barrientes v. Johnson*, 221 F.3d 741, 770 (5th Cir. 2000) (remanding for an evidentiary hearing because material factual disputes remained, precluding the court from resolving the petition on the basis of the paper record alone). Accordingly, we REVERSE the judgment of the district court and REMAND the

No. 09-10529

petition for an evidentiary hearing and further proceedings not inconsistent with this opinion.