# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**F I L E D**

May 23, 2013

Lyle W. Cayce
Clerk

No. 12-70002

LISA ANN COLEMAN,

Petitioner - Appellant

v.

RICK THALER, DIRECTOR, TEXAS DEPARTMENT OF CRIMINAL JUSTICE, CORRECTIONAL INSTITUTIONS DIVISION,

Respondent - Appellee

Appeal from the United States District Court
for the Northern District of Texas

Before HIGGINBOTHAM, DAVIS, and ELROD, Circuit Judges.

PATRICK E. HIGGINBOTHAM, Circuit Judge:

Texas prisoner Lisa Ann Coleman was convicted of capital murder and sentenced to death. A federal district court denied her petition for habeas relief, a judgment she seeks to appeal on three grounds. Because jurists of reason would not disagree with or find debatable the district court's rejection of her claims, we deny her request for a Certificate of Appealability.

## I. Factual and Procedural History

### A. Conviction

This case arises out of the death of nine-year-old Davontae Williams. On the morning of July 26, 2004, emergency services were summoned to Davontae's

home upon report of his "breathing difficulty." Paramedic Troy Brooks arrived at the residence only minutes later to find Davontae "obviously dead," inferring that Davontae had passed away several hours earlier. Davontae, Brooks testified, was clad only in bandages and a diaper, so "emaciated and underweight" that it was "shocking." Brooks and another paramedic each believed that nine-year-old Davontae weighed only twenty-five pounds.[1]

Crime Scene Investigator Regina Taylor testified that Davontae had "numerous injuries throughout . . . his entire body," including a disfigured ear, swollen hands, a slit in his lip, and "ligature marks around his wrists and ankles."[2] Pediatrician Nancy Kellogg identified over 250 wounds on his corpse. Dr. Konzelmann testified that injuries to Davontae's hands, arms, and ankles were consistent with his having been bound repeatedly. Konzelmann initially believed that Davontae had "life-threatening blunt-force injuries, perhaps bleeding on the brain, broken bones, et cetera" that caused his death.

Ultimately, however, Dr. Konzelmann deemed the cause of Davontae's death to be malnutrition with pneumonia. Dr. Peerwani, Chief Medical Examiner for Tarrant County, further testified that Davontae's pneumonia resulted from his malnutrition. And although Davontae was born prematurely, Dr. Kellogg explained that Davontae previously had "a normal growth velocity;" a metabolic disease, she inferred, was not responsible for his malnutrition. According to the State of Texas, however, Lisa Coleman was.

---

[1] Davontae weighed 35.8 pounds.

[2] Although Taylor described the injury to Davontae's lip as having "already healed up," she was evidently still able to identify it. Detective Jim Ford, moreover, described the injury by stating, "[h]e had an injury to his lip right here where it's like it was an old injury, it didn't heal." And Dr. Konzelmann, who autopsied Davontae's body, described "significant splitting and ulceration of the lip, which would make it not only very painful to eat, but would very likely make it mechanically very difficult to take liquid, too. It would tend to dribble out. When people drink from a cup, they use the lower lip to make a seal, and this would more or less not seal."

Lisa spent much of her time living with Marcella Williams, Davontae's mother. Lisa and Marcella were involved romantically and had been for several years. In 1999, for example, Child Protective Services (CPS) removed Davontae from Marcella's custody because Lisa was abusing him physically. CPS returned Davontae to Marcella on the condition that he "not be around Lisa Coleman."

Lisa nevertheless continued to interact with Davontae. Davontae's sister Destinee testified that Lisa would tie up Davontae with an extension cord. Lisa denied use of an extension cord, but admitted that she and Marcella had tied up Davontae on "several occasions."[3] Lisa further admitted to whipping Davontae with a belt, but claimed to have stopped doing so by March of 2004. She also admitted to causing Davontae's lip injury when, after she hit and pushed him, he fell into a bar stool.[4] But she denied knowledge of a golf club found in Marcella's apartment—a club that almost certainly had Davontae's blood on its head[5] and that likely had Lisa's DNA on its handle.[6] And she denied locking

---

[3] The defense argued that Davontae was a difficult child and that Marcella and Lisa were ill-equipped to raise him. Lisa acknowledged, for example, that "[a]bout a month and a half ago Davontae sneaked downstairs in the middle of the night and stood on a chair and turned on the stove and was going to cook him some eggs. He already had the eggs broken up in a bowl with salt and pepper on them. Marcella and I were afraid that [he] was going to poison himself or set the house on fire in the middle of the night, so I tied his arms with a shirt."

[4] Marcella's sister Latravier Williams saw Davontae in mid-May 2004 but did not notice any lip injury, suggesting that it was of recent origin.

[5] Carolyn Van Winkle from the Biology DNA section of the County Medical Examiner's Crime Lab testified that a blood stain on the head of the golf club "was a male DNA profile and it was the same as Davontae Williams' DNA profile." She further testified that "the probability of selecting an unrelated individual at random that would have the same DNA profile that was obtained from the golf club head . . . is approximately one in 54 quintillion in Caucasians, one in approximately eight quintillion in African-Americans, and one in approximately 44 quintillion in Southwest Hispanics."

[6] Van Winkle testified that the grip of the golf club had on it a mixture of DNA. She was able to exclude Marcella from the set of possible contributors, but Lisa was "not excluded." "99.9 percent of unrelated individuals would be expected to be excluded," Van Winkle added, "but [Lisa] was not."

Davontae in a pantry—one with a lock several feet off the ground and what appeared to be a pool of urine inside it.

Toward the end of his life, Davontae did receive some treatment. He appeared to have been given TheraFlu, Alka Seltzer, and NyQuil.[7] The ointments, creams, and bandages placed on his body evinced an attempt to treat his wounds. And evidence suggests that he ingested chicken noodle soup, PediaSure, and Pedialyte prior to his death. But Dr. Konzelmann testified that the food he received was "inadequate [on the whole], too late, and possibly too much [for a malnourished person]."

Dr. Konzelmann also opined that "[t]he attempt to treat . . . is as much an attempt to prevent [Davontae] from coming to the attention of the physicians who would have reported" his condition. Lisa essentially acknowledged as much; according to a CPS investigator, she stated that "Marcella did not want to take [Davontae] to a doctor because she was afraid that once they saw the bruises and marks on him, that CPS would be called and . . . her children would be taken away." She likewise admitted, according to a different CPS investigator, that "Marcella would tell people when they would ask where Davontae was that he was with her people [even though] he was actually in the apartment."

Texas charged Lisa with capital murder, a crime that includes murders committed intentionally "in the course of committing or attempting to commit kidnapping."[8] Lisa, the State argued, had at least aided and abetted Marcella in kidnapping Davontae in his own home: restraining him "with intent to prevent his liberation by . . . secreting or holding him in a place where he is not likely to

---

[7] Relying on pathologist Dr. Lesther Winkler, the defense argued that Davontae died from "aspiration pneumonia;" essentially, that he "drowned [i]n his own vomit," an accidental death.

[8] TEX. PENAL CODE § 19.03(a)(2). The current version of Texas's capital murder statute defines capital murder to include certain murders in which the victim is "an individual under 10 years of age." TEX. PENAL CODE at § 19.03(a)(8). At the time of Davontae's death and Lisa's conviction, however, that provision reached only victims under six years of age.

be found."[9] After fifty-six minutes of deliberation, a unanimous jury found Lisa guilty.

## B. Sentence

At the beginning of the punishment phase, Lisa pleaded true to a Habitual Offender Notice and the court brought forward all of the evidence admitted during the guilt/innocence phase. After brief testimony by the State's only witness, the defense called seven witnesses to describe Lisa's difficult past and project a non-violent future.

According to the evidence, Patricia Coleman became pregnant with Lisa when she was only thirteen years old, after her stepfather, James Bunch, molested her. Patricia was ill-equipped to parent; young and afflicted by mental challenges, she failed to prevent Lisa from being abused by other family members. Lisa was spanked at four months old for crying, whipped with extension cords, and sexually abused by her Uncle Leotis for at least three years. Lisa was also knifed in the back by a cousin at eleven years old—moments after she learned from her cousins' taunts that she was a product of molestation.

Lisa spent much of her childhood in foster care, beginning when she was only three years old. Her first foster home, in which she was likely sexually abused, burned down about two-and-a-half years after she arrived. While still in foster care, Lisa felt abandoned because her mother Patricia would often miss scheduled visits and rarely see her. At some point, however, Patricia did begin calling Lisa "Pig," a nickname that stuck until the time of trial and was cause for ridicule when Lisa was a child in school. This upbringing, expert testimony suggested, would make it difficult for Lisa to be a good parent.[10]

---

[9] TEX. PENAL CODE § 20.01(2) (defining "abduct"); *see also* TEX. PENAL CODE § 20.03(a) (providing that "[a] person commits [kidnapping] if he intentionally or knowingly abducts another person").

[10] An expert admitted on cross-examination that Davontae's injuries looked "torturous."

Lisa's later years were also troubled. She began using drugs at thirteen years old and started drinking at fourteen. At sixteen, she gave birth to her own child. And at some point, she was diagnosed with bipolar disorder.

Despite her upbringing, Lisa was described by family members as "playful" and "very good with kids." Lisa's younger sister Yvonne further testified that Lisa was "always there for [her]" and that she would "go crazy" if Lisa was sentenced to death. Testimony also suggested that Lisa would not be a future danger; although Davontae was a difficult child to parent, Lisa had no enemies in jail[11] and would be closely supervised while imprisoned.

The jury retired to deliberate just before 3pm on June 21, 2006. Fewer than four hours later, it found that Lisa would probably commit criminal acts of violence in the future; that she at least anticipated Davontae's life would be taken; and that no sufficient mitigating circumstances warranted a sentence of life imprisonment. Bound by state law, the court sentenced Lisa to death.

## C. Subsequent Proceedings

In December 2009, on direct review, the Texas Court of Criminal Appeals affirmed Lisa's sentence and conviction.[12] After unsuccessfully seeking a writ of habeas corpus from the Texas state-court system, she timely petitioned for federal habeas relief in the Northern District of Texas.[13] The district court denied her petition on its merits in January 2012.[14]

---

[11] At some point in her life, however, Lisa had been in a gang.

[12] *Coleman v. State*, AP-75,478, 2009 WL 4696064 (Tex. Crim. App. Dec. 9, 2009).

[13] *Coleman v. Thaler*, 4:11-CV-542-A, 2012 WL 171549 (N.D. Tex. Jan. 20, 2012).

[14] *Id.*

**D. Appeal**

Lisa now seeks a Certificate of Appealability (COA) so that she may appeal on three grounds: First, she argues that her legal team failed to investigate facts relevant to her conviction for capital murder, in violation of her Sixth Amendment right to counsel. Second, she argues that her legal team failed to investigate and present mitigation evidence, also in violation of her right to counsel. Third, she argues that she is incarcerated for an offense of which she is actually innocent, in violation of the Due Process Clause of each of the Fifth and Fourteenth Amendments.

## II. Standard of Review
### A. Habeas Relief

When a person is in custody pursuant to a state-court judgment, we may "entertain [her] application for a writ of habeas corpus . . . only on the ground that [s]he is in custody in violation of the Constitution or laws or treaties of the United States."[15] Even when we may entertain an application, however, our review of individual claims is circumscribed. The Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA) provides that when a habeas petitioner raises a claim that was adjudicated on the merits in state court, we may not grant her petition unless the adjudication resulted in a decision that was "based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding;"[16] or was "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States."[17]

---

[15] 28 U.S.C. § 2254(a).

[16] *Id.* § 2254(d)(2).

[17] *Id.* § 2254(d)(1). Our focus is on law established at the time of the state-court decision, irrespective of when the petitioner's conviction became final. *See Greene v. Fisher*, 132 S. Ct. 38, 42, 44 (2011). Our precedents are relevant, at most, only to the extent that they

Whether a decision is "contrary to" or an "unreasonable application" of clearly established law involves two distinct inquiries. A state-court decision is "contrary to" established law when a court "applies a rule that contradicts the governing law" or "confronts a set of facts that are materially indistinguishable from a decision of [the Supreme Court] and nevertheless arrives at a result different from [Supreme Court] precedent."[18] By contrast, a state-court decision is an "unreasonable application" of established law when it "correctly identifies the governing legal rule but applies it unreasonably to the facts of a particular prisoner's case."[19] The touchstone of this latter inquiry is whether the state court's application was "objectively unreasonable;"[20] clear error is insufficient,[21] and the more general the rule of law at issue, "the more leeway courts have in reaching outcomes in case-by-case determinations."[22] If "fairminded jurists could disagree" about the correctness of the state court's decision, that decision was not unreasonable.[23]

---

reflect law established by the Supreme Court. *See Parker v. Matthews*, 132 S. Ct. 2148, 2155 (2012) (per curiam) (citing *Renico v. Lett*, 130 S. Ct. 1855, 1865–66 (2010)).

[18] *Williams v. Taylor*, 529 U.S. 362, 406 (2000) [hereinafter *Terry Williams*].

[19] *Id.* at 407–08.

[20] *Price v. Vincent*, 538 U.S. 634, 643 (2003).

[21] *See Lockyer v. Andrade*, 538 U.S. 63, 75 (2003) ("The gloss of clear error fails to give proper deference to state courts by conflating error (even clear error) with unreasonableness.").

[22] *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004); *see also id.* ("Applying a general standard to a specific case can demand a substantial element of judgment. As a result, evaluating whether a rule application was unreasonable requires considering the rule's specificity.").

[23] *Harrington v. Richter*, 131 S. Ct. 770, 786 (2011) (quoting *Yarborough*, 541 U.S. at 664) (internal quotation marks omitted).

## B. Certificates of Appealability

A habeas petitioner must obtain a COA before she may appeal from a district court's denial of her petition.[24] We may issue such a certificate "only if the [petitioner] has made a substantial showing of the denial of a constitutional right."[25] When a district court denies relief on the merits of a claim, the petitioner must "demonstrate that reasonable jurists would find the . . . court's assessment of the [claim] debatable or wrong."[26]

Although we must review federal district courts' habeas rulings in light of the deference due to state-court judgments on the merits,[27] a petitioner seeking a COA need not demonstrate that any jurist would grant her habeas petition.[28] A COA requires only a debatable claim—not a claim on which the petitioner is likely to prevail. Moreover, "any doubt as to whether a COA should issue in a death-penalty case must be resolved in favor of the petitioner."[29]

## III. Ineffective Assistance Claims

Petitioner claims that her counsel was ineffective for failing to investigate certain evidence that may have been exculpatory and for failing to investigate

---

[24] *See* 28 U.S.C. § 2253(c)(1).

[25] *Id.* § 2253(c)(2).

[26] *Slack v. McDaniel*, 529 U.S. 473, 484 (2000); *see also Miller-El v. Cockrell*, 537 U.S. 322, 327 (2003) ("A petitioner satisfies [the 'substantial showing'] standard by demonstrating that jurists of reason could disagree with the district court's resolution of his constitutional claims or that jurists could conclude the issues presented are adequate to deserve encouragement to proceed further.").

[27] *See Miller-El*, 537 U.S. at 341; *see also Feldman v. Thaler*, 695 F.3d 372, 377 (5th Cir. 2012) ("Hence, in determining whether a COA should issue in this case, the question is *not* whether reasonable jurists could debate the correctness of the [state court's] rejection of [Lisa's] claims, but whether reasonable jurists could debate the district court's denial of habeas relief under the deferential standard of review mandated by [AEDPA].").

[28] *See Miller-El*, 537 U.S. at 338.

[29] *Pippin v. Dretke*, 434 F.3d 782, 787 (5th Cir. 2005).

evidence that may have mitigated her punishment. We first set out law relevant to both claims and then discuss each specifically.

## A. *Strickland* and Ineffective Assistance

The Sixth Amendment entitles a criminal defendant to the assistance of counsel for her defense.[30] It is not enough that "a person who happens to be a lawyer is present at trial along side the accused;"[31] instead, "the right to counsel is the right to the *effective assistance* of counsel."[32] Both at trial and in capital sentencing proceedings, "[t]he benchmark for judging any claim of ineffectiveness must be whether counsel's conduct so undermined the proper functioning of the adversarial process that the [proceeding] cannot be relied on as having produced a just result."[33]

In *Strickland v. Washington*, the Supreme Court explained that to obtain reversal of a conviction or death sentence based on ineffective assistance, a defendant must make two showings. First, she must show that her "counsel's performance was deficient."[34] Second, she must show "that the deficient performance prejudiced the defense."[35] The test is conjunctive. "Unless a defendant makes both showings, it cannot be said that the conviction or death

---

[30] *See* U.S. CONST. amend. VI ("In all criminal prosecutions, the accused shall enjoy the right to . . . to have the Assistance of Counsel for his defence.").

[31] *Strickland v. Washington*, 466 U.S. 668, 685 (1984).

[32] *Id.* at 686 (quoting *McMann v. Richardson*, 397 U.S. 759, 771 n.14 (1970)) (emphasis added).

[33] *Id.*

[34] *Id.* at 687.

[35] *Id.* In certain circumstances not relevant here, prejudice is presumed. *See id.* at 692.

sentence resulted from a breakdown in the adversary process that renders the result unreliable."[36]

To demonstrate deficient performance, "the defendant must show that counsel's representation fell below an objective standard of reasonableness"[37] as measured by "prevailing professional norms."[38] Our scrutiny of counsel's performance is highly deferential. We "must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.'"[39] To overcome this presumption, "[a] convicted defendant making a claim of ineffective assistance must identify the acts or omissions of counsel that are alleged not to have been the result of reasonable professional judgment."[40] Of central importance here, "choices made after less than complete investigation are reasonable [only] to the extent that reasonable professional judgments support the limitations on investigation."[41] Factors affecting whether it is reasonable not to investigate include whether counsel has "reason to believe that pursuing certain investigations would be fruitless or even harmful,"[42] resource

---

[36] *Id.* at 687.

[37] *Id.* at 688.

[38] *Id.*

[39] *Id.* at 689 (quoting *Michel v. State of La.*, 350 U.S. 91, 101 (1955)).

[40] *Id.* at 690.

[41] *Id.* at 691.

[42] *Id.*; *see also Wiggins v. Smith*, 539 U.S. 510, 525 (2003); *Terry Williams*, 529 U.S. at 395 ("[Counsel] failed to conduct an investigation . . . not because of any strategic calculation but because they incorrectly thought that state law barred access to such records."); *Burger v. Kemp*, 483 U.S. 776, 794 (1987).

constraints,[43] and whether the information that might be discovered would be of only collateral significance.[44]

To demonstrate prejudice, "[t]he defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different."[45] The "reasonable probability" standard is less demanding than a "more likely than not" standard;[46] "[a] reasonable probability is a probability sufficient to undermine confidence in the outcome" of a proceeding.[47] Accordingly, "[w]hen a defendant challenges a conviction, the question is whether there is a reasonable probability that, absent the errors, the factfinder would have had a reasonable doubt respecting guilt."[48] And "[w]hen a defendant challenges a death sentence[,] . . . the question is whether there is a reasonable probability that, absent the errors, the sentencer . . . would have concluded that the balance of aggravating and mitigating circumstances did not warrant death."[49] In answering either question, we must consider the totality of the evidence before the decisionmaker,[50] as well as

---

[43] *See Richter*, 131 S. Ct. at 789.

[44] *See Rompilla v. Beard*, 545 U.S. 374, 389 (2005); *see also id.* at 394 (O'Connor, J., concurring).

[45] *Strickland*, 466 U.S. at 694.

[46] *Id.* at 693.

[47] *Id.* at 694; *see also id.* ("The assessment of prejudice should proceed on the assumption that the decisionmaker is reasonably, conscientiously, and impartially applying the standards that govern the decision.").

[48] *Id.* at 695.

[49] *Id.*

[50] *See id.* at 695–96; *see also Wong v. Belmontes*, 558 U.S. 15 (2009) (per curiam) ("Additional evidence on these points would have offered an insignificant benefit, if any at all.").

whether presenting additional, exculpatory evidence would have opened the door to additional, inculpatory evidence.[51]

## B. Conviction

Petitioner first argues that her attorneys failed to investigate and present testimony from Tonya Coleman Brown, Sharon Coleman, and Marcella Williams. Petitioner raised these claims during state post-conviction proceedings, where they were rejected on the merits for want of deficiency and prejudice. We consider each claim in turn. Given the intersecting standards of review, we will grant a COA only if reasonable jurists would agree that, or at least find debatable whether, the state court unreasonably applied *Strickland*.[52]

### 1. Marcella Williams

On May 1, 2008, Marcella Williams gave a statement in which she claimed, among other things, that Davontae played outside with other children several times each week, and that any restraint of Davontae was done "with [her] permission or at [her] direction." Her statement, petitioner contends, contains information "vital and important to Coleman's defense to the kidnapping allegation." This claim is without force.

On post-conviction review, the state trial court found that Williams faced the death penalty for Davontae's death "[d]uring the entire pendency of [Lisa's]

---

[51] *See Belmontes*, 558 U.S. at 15 ("[I]t is necessary to consider *all* the relevant evidence that the jury would have had before it if Schick had pursued the different path—not just the mitigation evidence Schick could have presented, but also the Howard murder evidence that almost certainly would have come in with it."); *see also Feldman*, 695 F.3d at 380–81.

[52] Petitioner is not entitled to an evidentiary hearing. *See Cullen v. Pinholster*, 131 S. Ct. 1388, 1398 (2011). Petitioner's reliance on *Morris v. Thaler*, 425 F. App'x 415 (5th Cir. 2011) (per curiam) is misplaced. There, we remanded for an evidentiary hearing *after* determining that a state court acted unreasonably. *See id.* at 422 n.1. Even if the state court acted unreasonably, an evidentiary hearing would still be inappropriate here. *See* 28 U.S.C. § 2254(e).

case through the jury verdict." It also found that she had given "incriminating statements to the police and CPS" regarding Lisa. Most significantly, it found that both of Lisa's attorneys were familiar with Williams's court-appointed attorneys, and that they "knew any request to interview [Williams] would be refused due to the severity of the charges" that she faced and Williams's prior, incriminating statements.[53] Given these facts, Lisa's counsel were not objectively unreasonable in declining to inquire whether Williams would testify; they had good "reason to believe that . . . investigation[] would be fruitless or even harmful."[54] Reasonable jurists would not debate whether the state court was unreasonable in so holding.[55]

2–3. Tonya Coleman Brown and Sharon Coleman

Petitioner further contends that her counsel failed to interview and call as a witness Tonya Coleman Brown and Sharon Coleman. On April 30, 2008, Brown averred:

> My name is Tonya Coleman Brown. I reside at [redacted]. My date of birth is [redacted]. I have personal knowledge of the facts stated herein and they are true and correct.
>
> I am the Aunt of Lisa Ann Coleman. During the months leading up to July 26, 2004, I visited in the home of Lisa Ann Coleman and

---

[53] The state court based its findings on affidavits submitted by Lisa's trial counsel. It appears to have slightly overstated the contents of those affidavits. For example, only one of Lisa's attorneys claims that he knew *both* of Williams's lawyers; the other claimed that he knew *one* of Williams's lawyers. Regardless, the affidavits are unambiguous and uncontradicted on the point of greatest significance: Lisa's attorneys knew that Williams had a competent attorney who would not allow her to testify. Additionally, Williams told Detective Ford that "[s]ometimes after Lisa had been alone with Davontae I would notice unexplainable injures on Davontae" and that Lisa sometimes tied up Davontae with an electrical cord.

[54] *Strickland*, 466 U.S. at 691.

[55] Because Lisa fails to demonstrate deficient performance, we need not reach the prejudice question. We note, however, that Williams's statement does not claim that she would have testified if asked to do so. *Cf. Day v. Quarterman*, 566 F.3d 527, 538 (5th Cir. 2009) ("[T]he petitioner . . . must demonstrate that the witness was available to testify and would have done so.").

No. 12-70002

Marcella Williams approximately one or two times a month. When I visited with Lisa and Marcella, I constantly saw Davontae Williams playing with other children, running around, and acting like a normal child. I never saw Davontae restrained or tied up in any manner whatsoever. In addition, every time I saw Davontae he appeared to be in good health.

I was never contacted by Lisa Coleman's lawyers or any other person prior to Lisa's trial. If I had been contacted, I would have related these facts to that person and been ready and able to testify to the facts stated herein.

On the same day, Sharon Coleman averred:

My name is Sharon Coleman. I reside at [redacted]. My date of birth is [redacted]. I have personal knowledge of the facts stated herein and they are true and correct.

I am the sister of Lisa Ann Coleman. During the months leading up to July 26, 2004, I lived about eight apartments away from Lisa Coleman and Marcella Williams and visited in their home on a daily basis. During this time, I constantly saw Davontae Williams playing outside with other children. I also saw Davontae playing outside in various places such as the park and the playground with his sisters and other children from the neighborhood. I constantly saw D[a]vontae running around and acting like a normal child. I remember many times that neighbor children would go to Davontae's apartment and he would go outside and play with them. During all the time I spent at the home of Lisa Coleman and Marcella Williams, I never saw Davontae restrained or tied up in any manner whatsoever. In addition, every time I saw Davontae he appeared to be in good health.

I was never contacted by Lisa Coleman's lawyers or any other person prior to Lisa's trial. If I had been contacted, I would have related these facts to that person and been ready and able to testify to the facts stated herein.

On post-conviction review, the state trial court ordered each of Fred Cummings and Michael Heiskell, Lisa's trial counsel, to submit an affidavit addressing these claims.

In his affidavit, Cummings explained that Sharon and Tonya each spoke with a member of the defense team before trial. His affidavit reads, in pertinent part:

> Within two weeks of my appointment to represent [Lisa] . . ., we had a defense team in place that consisted of two death penalty qualified counsel; . . . an experienced private investigator; and Toni Knox, an experienced mitigation investigator. We met as a group on at least five occasions to discuss legal issues, investigation details, and mitigation themes in our formulation of a defense for [Lisa]. . . . I communicated extensively by telephone and email with Mr. Heiskell and Ms. Knox and met with each individually during the eighteen months prior to and during trial. . . . Ms. Knox interviewed over two dozen family members, including Sharon Coleman and Tonya Coleman, and prepared summaries of those interviews that were shared with each team member as email attachments. . . . The strengths and weaknesses of each of those family members as potential witnesses were considered and discussed.

The record suggests that Knox spoke with Sharon and Tonya primarily regarding mitigation issues, and the state court did not find otherwise. We need not consider whether effective counsel would have investigated further, however, because petitioner has not demonstrated prejudice.

"This Court has repeatedly held that complaints of uncalled witnesses are not favored in federal habeas corpus review because the presentation of testimonial evidence is a matter of trial strategy and because allegations of what a witness would have stated are largely speculative."[56] It is particularly difficult to credit uncalled witnesses' affidavits where, as here, the record directly contradicts their claim that they were "never contacted." Regardless, even considered together, the affidavits fall short of debatably establishing a "reasonable probability" that the result of Lisa's trial would have been different.

Considered together, Tonya and Sharon's affidavits appear to make four claims. First, Davontae was seen constantly playing outside with other children.

---

[56] *Day*, 566 F.3d at 538.

Second, he was "acting like a normal child." Third, neither Tonya nor Sharon ever saw Davontae "tied up" or "restrained." And fourth, Davontae always appeared to be in good health.

Two of these claims are of little import. The third literally means only that Tonya and Sharon never *saw* Davontae restrained; the affidavits do not speak to whether he *was actually* restrained—and if they did, their statements would be contradicted by both overwhelming physical evidence and Lisa's admission to the contrary. The fourth claim, that Davontae was in good health, would have likewise had no probity, let alone a reasonable probability of convincing jurors to disregard the gruesome photographs and extensive testimony regarding Davontae's poor health.

That Davontae allegedly played outside constantly is of greater concern; it goes to the component of the capital murder charge on which the State's proof was weakest: kidnapping. Even here, the affidavits fall short. Tonya claims to have seen Davontae playing outside "constantly," but admits to having visited only one or two times each month. Sharon's affidavit claims more routine observation. But according to Knox's notes, Sharon admitted "that in order to get [Davontae] to go outside for a picture or to play with the other children, everyone in the apartment had to go outside and lock the doors." And the affidavits do not contradict the evidence that medical treatment was withheld from Davontae to avoid a call to CPS.

The remaining claim, that Davontae acted like a "normal child," would (if anything) have *increased* the probability of petitioner's conviction. Part of counsel's strategy at trial was to describe Davontae as a difficult child to raise, one whose mistreatment resulted from Lisa and Williams's lack of parenting abilities. The more "normal" Davontae, the more abhorrent his supposed caretakers' response.

In sum, petitioner asks us to overturn her conviction based on two nearly identical statements, offered by family members, which in several places flatly

contradict the inescapable weight of the evidence before the state court. We cannot do so. Reasonable jurists would not conclude that, or even debate whether, petitioner has demonstrated prejudice—let alone whether the state court's determination otherwise was unreasonable.

## C. **Mitigation**

Petitioner next claims that her counsel failed to investigate adequately and present all available mitigation evidence. Petitioner raised this claim during state post-conviction proceedings, where it was rejected on the merits for want of deficiency and prejudice. Her claim appears to rest on two theories: (1) her attorneys should have obtained neuropsychological testing and (2) "the jury was not presented evidence regarding Lisa's own horrific upbringing and her lack of understanding or knowledge of basic parenting skills."

Neither theory has merit. Regardless of whether petitioner's attorneys should have obtained neuropsychological testing, Lisa identifies no evidence establishing what that testing would have revealed.[57] She likewise does not explain why that evidence would have been more than cumulative of the evidence presented during the punishment phase, including that Lisa had been diagnosed as bipolar. Without knowing what evidence counsel failed to uncover, we cannot conclude that the evidence would have had a reasonable probability of changing the outcome of petitioner's sentencing. Nor could reasonable jurists debate that conclusion—let alone whether the state court reached it unreasonably.

---

[57] The state court found that "[a]lthough [Lisa] suggests that additional mitigation evidence could have been discovered and presented at trial, she fails to present any evidence to support her allegation and fails even to identify the sources of such evidence." Although Lisa points out that her attorneys unsuccessfully moved for a continuance to obtain additional mitigation evidence before the punishment phase, this does not explain why her post-conviction writ lacks adequate support.

The second theory is similarly unsupported with respect to prejudice. And with respect to deficiency, we agree with the district court that "[t]he state habeas record affirmatively discloses that the trial defense team thoroughly investigated potential mitigation evidence" and presented that information adequately.[58] Because reasonable jurists would not debate this conclusion (or whether the state court reached that conclusion unreasonably), we cannot grant a COA on this claim.

## IV. Actual Innocence Claim

Petitioner finally contends that she is "actually innocent" of capital murder because she did not kidnap Davontae. Her theory is essentially a repackaged version of her first ineffective assistance claim: the affidavits of Marcella Williams, Tonya Coleman Brown, and Sharon Coleman, she reasons, establish that she did not commit a kidnapping. She raised this claim during state post-conviction proceedings, where it was rejected on the merits.

"'Claims of actual innocence based on newly discovered evidence have never been held to state a ground for federal habeas relief absent an independent constitutional violation occurring in the underlying state criminal proceeding.'"[59] In *Herrera v. Collins*, the Supreme Court assumed, arguendo, "that in a capital case a truly persuasive demonstration of 'actual innocence' made after trial would . . . warrant habeas relief if there were no state avenue open to process such a claim."[60] But we have rejected that assumption.[61] And we

---

[58] *Coleman v. Thaler*, 4:11-CV-542-A, 2012 WL 171549, at *16 (N.D. Tex. Jan. 20, 2012).

[59] *Dowthitt v. Johnson*, 230 F.3d 733 (5th Cir. 2000) (quoting *Herrera v. Collins*, 506 U.S. 390, 400 (1993)).

[60] *Id.* (quoting *Herrera*, 506 U.S. at 417) (some internal quotation marks omitted).

[61] *See Graham v. Johnson*, 168 F.3d 762, 787 (5th Cir. 1999) (citing *Lucas v. Johnson*, 132 F.3d 1069, 1074–76 (5th Cir. 1998)).

have implied that, even if the assumption were embraced, the availability of clemency in Texas would defeat a freestanding innocence claim.[62]

Perhaps for those reasons, petitioner suggests that she instead presents a "*Schlup* type claim." In *Schlup v. Delo*, the Supreme Court distinguished freestanding, *substantive* innocence claims—in which a petitioner asserts that her innocence entitles her to habeas relief—from *procedural* innocence claims—in which a petitioner seeks to "have [her] otherwise barred constitutional claim considered on the merits."[63] The distinction makes clear that petitioner's claim is substantive rather than procedural. Although her innocence claim is similar to her first ineffective-assistance claim, she is not using it *to obtain review* of that ineffective-assistance claim. Indeed, she has no reason to do so: we can consider and have considered the merits of that claim, which is subject to no procedural bar. As reasonable jurists would not debate this conclusion, we cannot grant a COA.

\* \* \*

Because reasonable jurists would not disagree with, or even debate, the district court's rejection of petitioner's claims, we DENY her request for a COA.

---

[62] *See id.* ("Moreover, there *is* a state avenue open to [petitioner]: He retains his right to petition the Texas Board of Pardons and Paroles for clemency."); *Lucas*, 132 F.3d at 1075.

[63] *Schlup v. Delo*, 513 U.S. 298, 315 (1995) (quoting *Herrera*, 506 U.S. at 404).