# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

No. 12-10540

United States Court of Appeals
Fifth Circuit

**FILED**

May 2, 2014

Lyle W. Cayce
Clerk

JUSTIN S. WHITE,

Petitioner-Appellant

v.

WILLIAM STEPHENS, Director, Texas Department of Criminal Justice, Correctional Institutions Division,

Respondent-Appellee

Appeal from the United States District Court
for the Northern District of Texas
USDC No. 2:09-CV-40

Before STEWART, Chief Judge, and HIGGINBOTHAM and ELROD, Circuit Judges.

PER CURIAM:*

A Texas jury convicted Justin S. White of murder and sentenced him to 30 years of incarceration. After exhausting state direct and collateral review, White sought federal habeas relief in the district court, arguing, *inter alia*, that he state trial court violated his constitutional rights by overruling his *Batson*[1]

---

* Pursuant to 5TH CIR. R. 47.5, the court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in 5TH CIR. R. 47.5.4.

[1] *Batson v. Kentucky*, 476 U.S. 79 (1986) (striking members of a jury based solely on their race is a violation of the equal protection clause).

No. 12-10540

challenge to the racial composition of his jury.  The district court denied habeas relief, and we granted a Certificate of Appealability ("COA").  We AFFIRM.

**I**

Following a fight, Davis S. Berliner was murdered outside a night club. A police investigation linked Justin S. White to the murder.  White had been involved in the fight at the nightclub, had been seen waiving a handgun in the air, and was thrown out of the club by the manager and bouncer shortly before the shooting.  Shortly after the shooting, White approached a vehicle leaving the club with a handgun, and told the occupants that he thought he had just shot either the club's bouncer or manager.

A Texas state jury convicted White and sentenced him to 30 years in prison.  White timely appealed the conviction and sentence to the Texas Seventh Court of Appeals, which affirmed the conviction and sentence by unpublished opinion.[2]

On August 29, 2007, White filed a state habeas application, alleging ineffective assistance of appellate counsel.  In this application, White requested that he be permitted to file an untimely petition for discretionary review.  The Texas Court of Criminal Appeals ("CCA") granted permission, and White filed the petition asserting legal and factual insufficiency grounds for reversal.  The CCA then refused the petition.

On August 14, 2008, White filed a second state habeas application, alleging (i) that he was denied a fair trial because five of the jurors were biased and prejudiced against him; (ii) that the state trial court violated his constitutional rights by overruling his *Batson* challenge to the racial composition of the jury; (iii) that there was insufficient evidence to support the

---

[2] *White v. Texas*, No. 07-05-0271-CR, 2006 WL 2612642 (Tex. App.—Amarillo 2006, pet. ref'd).

2

No. 12-10540

murder conviction; (iv) that he was denied effective assistance of appellate counsel; and, (v) that the trial court erred by dismissing the wrong juror when it dismissed the alternate juror prior to deliberations. On November 5, 2008, the CCA denied White's application without written order.

On February 6, 2009, White filed a timely application for federal habeas relief in the federal district court. Over White's objections, the district court adopted the Report and Recommendation issued by the United States Magistrate Judge, and denied White's application for a federal writ of habeas corpus. The district court then denied a COA. We granted a COA solely on the *Batson* issue. White timely appeals.

## II

We review the district court's findings of fact for clear error and its legal conclusions *de novo*.[3]

The Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") mandates deference to state court proceedings. Accordingly, if "a state court has adjudicated a habeas petitioner's claims on the merits, he may receive relief in the federal courts only where the state court decision 'resulted in a decision that was contrary to, or involved an unreasonable application of clearly established federal law," or "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."[4] In determining whether the state court's decision was reasonable, our consideration is limited to the record before the state court at the time of the ruling.[5]

---

[3] *Rivera v. Quarterman*, 505 F.3d 349, 359 (5th Cir. 2007) (citing *Woods v. Quarterman*, 493 F.3d 580, 584 (5th Cir. 2007)).

[4] *Rivera*, 505 F.3d at 355 (quoting 28 U.S.C. § 2254(d)).

[5] *See Cullen v. Pinholster*, 131 S.Ct. 1388, 1398 (2011); *Blue v. Thaler*, 665 F.3d 647, 656 (5th Cir. 2011) (*Pinholster* prohibits "a federal court from using evidence that is [first]

3

No. 12-10540

To determine whether a decision is "contrary to" or an "unreasonable application" of clearly established federal law involves two distinct inquiries: (i) "[a] state-court decision is 'contrary to' established law when a court 'applies a rule that contradicts the governing law' or 'confronts a set of facts that are materially indistinguishable from a decision of [the Supreme Court] and nonetheless arrives at a result different from [Supreme Court] precedent;"[6] and (ii) " a state-court decision is an 'unreasonable application' of established law when it 'correctly identifies the governing legal rule but applies it unreasonably to the facts of a particular prisoner's case.'"[7] The touchstone of the reasonableness inquiry is "whether the state court's application was 'objectively unreasonable;'" accordingly, "clear error is insufficient."[8] Thus, if "fairminded jurists could disagree about the correctness of the state court's decision, that decision was not unreasonable."[9]

## III

With the AEDPA framework firmly in mind, we turn to the merits. Under *Batson*, courts must engage in a three-step framework to evaluate claims that a prosecutor used peremptory challenges in violation of the Equal Protection Clause: (1) "a defendant must first make a *prima facie* showing that the prosecutor used a peremptory challenge to strike a juror on the basis of race;" (2) "if the defendant made such a showing, the prosecution must then offer a race-neutral basis for the strike;" and, (3) "the district court must determine whether the defendant has carried his burden of proving purposeful

---

introduced in [a federal habeas proceeding] as the basis for concluding that a state court's adjudication is not entitled to deference under § 2254(d).").

[6] *Coleman v. Thaler*, 716 F.3d 895, 901 (5th Cir. 2013) (quoting *Williams v. Taylor*, 529 U.S. 362, 406 (2000)).

[7] *Id.* at 901–02 (quoting *Williams*, 529 U.S. at 407–08)).

[8] *Id.*

[9] *Id.*

4

discrimination."[10]   This ultimate conclusion of discriminatory intent is a finding of fact.[11]

As the Supreme Court has explained, "the critical question in determining whether a prisoner has proved purposeful discrimination at step three is the persuasiveness of the prosecutor's justification for his peremptory strike.  At this stage, implausible or fantastic justifications may (and probably will) be found to be pretexts for purposeful discrimination."[12]  The "ultimate inquiry for the judge is not whether counsel's reason is suspect, or weak, or irrational, but whether counsel is telling the truth in his or her assertion that the challenge is not race-based."[13] And "these determinations of credibility and demeanor lie peculiarly within a trial judge's province, and . . . in the absence of exceptional circumstances, we would defer to the trial court."[14]

Here, White argues that at step 3, the state court impermissibly erred in denying his *Batson* challenge to the State's exercise of a peremptory challenge to venire member Gerry Don Glass, an African-American male.  The State offered two reasons for challenging Glass: (i) his demeanor "during the course of questioning, and in response to answers, was both belligerent and reluctant[,]" and (ii) "his brother or somebody . . . had some legal problems or something like that."[15]  With respect to Glass' demeanor, the State explained

---

[10] *United States v. Thompson*, 735 F.3d 291, 296 (5th Cir. 2013) (citing *Batson*, 476 U.S. at 93–98).

[11] *Thompson*, 735 F.3d at 296.

[12] *Miller-El v. Cockrell*, 537 U.S. 322, 338–39 (2003).

[13] *United States v. Bentley-Smith*, 2 F.3d 1368, 1375 (5th Cir. 1993).

[14] *Snyder v. Louisiana*, 552 U.S. 472, 477 (2008).

[15] State Trial Transcript, Vol. 4, at 120.  When asked by the court to give "a racially neutral reason . . . for you . . . exercising your preemptory [sic] challenge[,]" the State explained as follows:

> With respect to Mr. Glass, his demeanor during the course of questioning, and in response to answers, was both belligerent and reluctant.  He was sitting there with his arms crossed the whole time—the physical characteristic indication of someone

that "[h]e was sitting there with his arms crossed the whole time—the physical characteristic indication of someone who is closed off to you. We didn't like his demeanor in that behalf." White argues that these reasons were pretextual. First, White explains that the record does not convey Glass's demeanor, and thus, the state trial court's failure to make any findings as to Glass's demeanor means that we cannot presume that the state trial court credited the prosecutor's assessment of demeanor; indeed, there are only a couple instances of Glass' testimony during voir dire in the record, and neither reflects his demeanor.[16] Second, White argues that the State's second race-neutral reason was pretext, as he claims that white jurors who had relatives in jail were allowed to serve on the jury.

We disagree. A review of the record makes clear that the state court's decision was not an unreasonable application of federal law. To begin with, *Snyder* does not require trial courts to make record findings regarding a juror's demeanor.[17] This is because "unlike the attorneys, [the trial court] may not always be [in] a position to observe and record a potential juror's demeanor."[18] Although it might be "better practice for the court to put its findings on the record[,] . . . *Synder* does not require that."[19] Yet, because the State offered

---

who is closed off to you. We didn't like his demeanor in that behalf. Additionally . . . there was some reason—his brother or somebody, I believe, had been—had some legal problems or something like that. And that's our reasons on Mr. Glass.

[16] First, when the State asked the jurors whether they understood reasonable doubt, Glass answered "You are for sure of it, there's no doubt . . . You've got all your evidence, there's no doubt." Second, when White asked whether Glass could acquit even if the guilty party was never found, he nodded affirmatively, and when White asked whether Glass had served on a grand jury before, he answered yes.

[17] *Thompson*, 735 F.3d at 301; *see also Thaler v. Haynes*, 559 U.S. 43, 48 (2010) ("*Batson* plainly did not go further and hold that a demeanor-based explanation must be rejected if the judge did not observe or cannot recall the juror's demeanor. Nor did we establish such a rule in *Snyder*.").

[18] *Id.*

[19] *Id.*

two explanations for the strike, and the state trial judge did not specify on which explanation he relied, "we cannot presume that the trial judge credited the [State's] assertion" regarding Glass's demeanor.[20]  Accordingly, we next examine whether the State's second reason—that Glass' brother in law is in prison—is pretextual.

Here, we cannot conclude that the prosecutor's second reason is pretextual.  First, we note that it is impossible to tell from the record whether Glass was the unidentified veniremember who answered that he had a brother-in-law in jail.  The trial transcript only identifies an "unidentified prospective juror" with a brother-in-law in jail.[21]  Although the State makes a persuasive argument that the answer can be attributed to him, a conclusive determination is impossible, because the record does not disclose the identity of that juror.  But, given the deferential standard of review of AEDPA, we cannot say that the attributing the answer to Glass is an unreasonable determination of the facts.

Second, White argues that this rationale must be mere pretext for discrimination because three empanelled jurors also had relatives in jail.  And White argues that at least two of these jurors, unlike Glass, were white.  But there is no record evidence identifying the racial composition of the empaneled jurors.  Additionally, the three empanelled jurors with incarcerated relatives are distinguishable from Glass; all three believed that it is better that their relatives are in jail.  Juror 19, Deborah Baker, whose cousin was in jail, stated that "[h]e probably needs to be there."[22]  Juror 32, Julia Buckstead, whose brother was in jail, explained that she felt "like he needs to be there, and I hope

---

[20] *Snyder*, 552 U.S. at 479.

[21] State Trial Transcript, Vol. 4, at 43.

[22] *Id.* at 42.

it will turn his life around."[23]  Similarly, Juror 38, Terri Mix, whose daughter's father was in jail, explained, "[h]opefully it will change his ways and he'll be able to straighten up and be able to come home and see her."[24]  In contrast to these views, the views of the unidentified veniremember who is likely Glass were ambivalent at best.  When asked about his feelings about his brother-in-law being incarcerated, he stated "I really don't know.  You know, I talk to him. I really don't know."[25]  The State followed up with that question by asking whether he was close to the incarcerated relative, and he answered "Yeah.  We grew up together, pretty much."[26]  These answers reflect an ambivalence about his relative's incarceration not present in the answers of the empanelled jurors. Because there are meaningful differences between Glass and the empanelled jurors, and because the race of these comparator jurors cannot be determined from the record, we cannot conclude that this explanation for the preemptory strike was pretextual.  Accordingly, because "fairminded jurists could disagree about the correctness of the state court's decision, that decision was not unreasonable."[27]

For these reasons, we AFFIRM.

---

[23] *Id.* at 48.

[24] *Id.* at 49–50.

[25] *Id.* at 43.

[26] *Id.* at 43–44.

[27] *Coleman*, 716 F.3d at 901–02.